METROPOLITAN HOUSING DEVELOP-
MENT CORP. et al., Plaintiffs,

Northwest Opportunity Center and
Eluteria D. Maldonado,
Intervening Plaintiffs,

v.

VILLAGE OF ARLINGTON HEIGHTS, a
Municipal Corporation, et al.,
Defendants,

and

Village of Mount Prospect, a Municipal
Corporation, Intervening Defendant,

Forest View Civic Association Inc. et al.,
Intervening Defendants and
Counter Plaintiffs,

and

Surrey Ridge Homeowners Association et
al., Intervening Defendants and
Counter Claimants.

No. 72 C 1453.

United States District Court,
N. D. Illinois, E. D.

April 2, 1979.

R. Marlin Smith and James M. Phipps, Chicago, Ill., for intervening defendant Village of Mount Prospect.

Staehlin, Jantorni & Sullivan, Chicago, Ill., for intervening defendants and counter claimants.

Daniel D. Mangiamele, Chicago, Ill., for intervening defendants and counter plaintiffs.

BUA, District Judge.

This important and celebrated zoning discrimination case was filed in 1972. The plaintiffs and defendants have strenuously contested the issues over a number of years. They have obtained two opinions from the court of appeals and one from the United States Supreme Court. After the remand of the case to this court last year, the original parties negotiated a settlement agreement and asked this court to enter a consent decree. The Village of Mount Prospect and other parties objected to the proposed decree, and this court allowed them to intervene. Three days of hearings were held last September. After fully developing and exploring all of the issues, the court now enters the consent decree.

I. *FACTS.*

Plaintiff Metropolitan Housing Development Corporation (MHDC) contracted to purchase a parcel of land located in the defendant Village of Arlington Heights (the St. Viator property). MHDC, a non-profit corporation, planned to construct a racially integrated moderate and low-income housing project to be known as Lincoln Green. The contract was contingent upon MHDC's ability to obtain proper zoning from the Village and financial assistance from the federal government.

MHDC filed a petition with the Village for rezoning of the St. Viator site from a single-family to a multiple-family classification. Following a series of public meetings, the Arlington Heights Board of Trustees voted to deny the petition for rezoning. MHDC, together with three black individuals seeking low cost housing in Arlington

F. Willis Caruso, Sybille C. Fritzsche, Chicago, Ill., Robert G. Schwenn, Lexington, Ky., for plaintiffs.

Jack M. Siegel, Chicago, Ill., for defendants.

Heights, then filed suit against the Village in the District Court for the Northern District of Illinois, requesting injunctive and declaratory relief. The plaintiffs claimed that the Village's refusal to rezone was racially discriminatory, violating their rights under, *inter alia,* the Equal Protection Clause of the Fourteenth Amendment and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

The district court held that the Village's action did not violate the Equal Protection Clause because it was motivated by a desire to protect local property values and the integrity of the Village's zoning plan, rather than by racial discrimination or opposition to low-income housing. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 373 F.Supp. 208, 211 (N.D.Ill.1974). The court observed that no section of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* seemed applicable to the facts of the case. 373 F.Supp. at 209. *Cf. Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1286 n. 2 (7th Cir. 1977) (district court did not rule on Fair Housing Act claim either because plaintiffs did not pursue it or because they did not consider it different from their constitutional claim).

The Seventh Circuit approved the district court's finding that there was no discriminatory purpose underlying the Village's refusal to rezone. Nevertheless, it reversed that court's decision on the ground that the "ultimate effect" of the denial of rezoning was unconstitutional because it would disproportionately disadvantage blacks. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 517 F.2d 409, 413–15 (7th Cir. 1975).

The Supreme Court reversed the decision of the court of appeals. It held that a showing of discriminatory intent was necessary to establish a violation of the Equal Protection Clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Since the court of appeals had affirmed the district court's determination that there was no discriminatory motive underlying the Village's refusal to rezone, the Supreme Court held that the plaintiffs had suffered no deprivation of their constitutional rights. 429 U.S. at 268–71, 97 S.Ct. at 565–566. The Court then remanded the case to the Seventh Circuit for a determination of whether the Village's refusal to rezone the land violated the Fair Housing Act. 429 U.S. at 271, 97 S.Ct. at 565–566.[1]

On remand, the court of appeals held that the Village of Arlington Heights has a statutory obligation under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* to refrain from the perpetuation of zoning policies that effectively foreclosed construction of low-cost housing within its boundaries.[2] *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977). In analyzing the case, the Seventh Circuit ruled that the presence or absence of an actual discriminatory effect caused by the Village's zoning decision would be decisive. The case was therefore remanded to this court for a determination of whether there was land in Arlington Heights, other than the St. Viator site, which was properly zoned and suitable for federally subsidized low-cost housing. If

---

1. The Supreme Court's decision in this case has provoked a large amount of commentary in the legal journals. *See, e. g.,* Mandelker, *Racial Discrimination and Exclusionary Zoning: A Perspective on* Arlington Heights, 55 Tex.L. Rev. 1217 (1977). Schwemm, *From* Washington *to* Arlington Heights *and Beyond: Discriminatory Purpose in Equal Protection Litigation,* 1977 U.Ill.L. Forum 961; Comment, *Proof of Racially Discriminatory Purpose Under the Equal Protection Clause:* Washington v. Davis, Arlington Heights, Mt. Healthy *and* Williamsburg, 12 Harv.C.R.–C.L.L.Rev. 725 (1977).

2. The court observed that the Village was acting pursuant to a statutory grant of authority and that there was no evidence that its refusal to rezone resulted from intentional racial discrimination. Nevertheless, it applauded what it perceived to be the efforts of MHDC to effectuate the national goal of integrated housing by attempting to construct such housing on its own property and noted that MHDC was merely seeking to enjoin the Village from interfering with that goal rather than petitioning the court for affirmative relief. *See* 558 F.2d at 1293.

the Village was unable to identify any such land within its boundaries, its refusal to rezone the St. Viator site would be held to violate the Fair Housing Act because that refusal would have precluded MHDC from constructing low-cost housing in Arlington Heights. Only then would plaintiffs be entitled to the relief they sought, the rezoning of the St. Viator property to permit construction of multi-family housing. 558 F.2d at 1295.

The Village of Arlington Heights sought certiorari in the Supreme Court. When it was denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), the case was remanded to this court for further proceedings consistent with the order of the court of appeals.

This court called the matter for a status report in March, 1978, and was advised by the parties that negotiations had commenced. They stated that the case would be resolved by the entry of a consent decree, obviating the need for a trial of the remanded issues. As a result of the ensuing negotiations, a tentative agreement was reached which provided for construction of a modified development on an alternate site.[3]

This alternate site currently is not in Arlington Heights. Rather, it is located in an unincorporated area of Cook County, between Arlington Heights and the Village of Mount Prospect. It contains approximately 26 acres, bounded on the north by Lawrence Lane in Mount Prospect and Prairie Park, on the east by a vacant parcel of land lying north and west of St. Cecilia Catholic Church, on the south by Golf Road, and on the west by Belmont Avenue, extended from its present location adjacent to the western boundary of Prairie Park to Golf Road.[4]

The subject property is vacant. Part of it is classified as C–2 Commercial under the Cook County Zoning Ordinance. The remainder is classified for R–5 Single Family Residence use. No part of the subject property is currently zoned for the construction of multiple family residences.

Under the terms of the consent decree, Arlington Heights would annex the subject property and rezone it to conform with MHDC's planned use.[5] Fourteen acres of the property would be developed for commercial use by an independent developer. The proposed development on the remaining twelve acres would be an updated version of the original Lincoln Green project. The financing would be different, the units designed for the elderly would be in a separate building, and the low and moderate-income family townhouses segment would involve a less intensive use of land than that originally proposed.

The parties made a further report on June 22, 1978, at which time the court continued the matter to June 30, 1978, for entry of the consent decree. On June 30, the Village of Mount Prospect moved to intervene as a defendant in order to object to entry of the proposed decree.

In its petition, Mount Prospect sought, in the alternative, permissive intervention and intervention as of right. Mount Prospect argued that the court had no authority to enter the decree. It also claimed that entry of the decree would be unjust and inequitable, due to its potential effect on the citizens of Mount Prospect.

While the court was considering Mount Prospect's petition, it delayed entry of the consent decree. On July 5, 1978, the Board of Trustees of Arlington Heights had an open meeting to receive public comment on the decree, which it had previously developed in closed sessions. After listening to

3. The consent decree was entered into evidence at the hearing as Intervening Defendant Mount Prospect Exhibit No. 8. It is attached as Appendix A.

4. Various maps and photos depicting the subject property were introduced into evidence by the parties.

5. Pursuant to the express terms of a boundary agreement between Mount Prospect and Arlington Heights dated June 21, 1976, the authority to zone the property belongs exclusively to Arlington Heights.

the comments, the Board voted to approve the decree. The normal procedures for preparing and approving an annexation and/or rezoning proposal were not followed.[6]

On August 21, 1978, this court, by unreported order, granted Mount Prospect permissive intervention, without deciding whether it was entitled to intervene as of right. Mount Prospect is before the court in its corporate capacity, as a representative of its residents.

Additional parties applied to the court for permission to intervene. These parties represented landowners in the vicinity of the subject property. On August 24, 1978, the court allowed Forest View Civic Association, Anthony Flaco, Joanne Flaco, Joseph Cipriano, Pamela Cipriano, Henry Lassen, and Constance Lassen, all of whom are either property owners or representatives of owners of land north and west of the alternate site, to intervene as defendants. On September 18, 1978, the Surrey Ridge Homeowners Association, John Roese, Gerald Hoeff, Frank Schnobel, and the Heritage Park Community Association, Inc., additional owners and representatives of owners of neighboring land, were also given leave to intervene. All of these defendant-intervenors presented claims and arguments that were similar to those presented by Mount Prospect.

The court scheduled this case for a hearing on the objections to the consent decree. After three days of hearings, on September 25, 27 and 29, the court took this matter under advisement. The parties were allowed to file proposed findings of fact and conclusions of law. In December, they were also requested to file additional briefs in response to a question of law presented by the court.

Thus, this matter has been given lengthy and detailed consideration. After evaluating the evidence and the legal arguments presented by all parties, the court issues this opinion as its finding of fact and conclusions of law, pursuant to Rule 52, Fed.R. Civ.P. *Cf. In Re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979) (vacating district court approval of class action settlement).

## II. *INTRODUCTION.*

The legal arguments of the original parties and those of the intervenors reflect very different approaches to this case. The original parties emphasize that two strong federal policies mandate the approval of the consent decree: the congressional policy favoring open housing and the judicial policy favoring the compromise settlement of cases.[7] The intervenors emphasize several procedural irregularities in the actions taken by Arlington Heights which assertedly invalidate the decree. They question the Village's authority to consent to the decree and the court's authority to approve it. In order for the court to decide this case in favor of the original parties, it must override some of the procedural rights of the intervenors. On the other hand, if this court were to decide for the intervenors, it would be acting contrary to those decisions of the Seventh Circuit Court of Appeals that have emphasized the federal policies.

In this opinion, the court will review the federal policies favoring entry of the decree and the procedural objections raised by the intervenors. The court will also discuss the intervenors' substantive objections to the proposed annexation and rezoning. These latter objections, unlike the procedural objections, do not greatly trouble the court, for they were shown to be meritless during the hearing held last fall.

---

**6.** The normal procedure includes formal and informal meetings between the developer and the Village staff, meetings with the Plan Commission and its Plat and Subdivision Committee, and a hearing before the Village Board. This procedure is required by the applicable municipal ordinances of Arlington Heights.

**7.** The general policy favoring the resolution of legal controversies through single, and not multiple litigation, *see Federal Resources Corp. v. Shoni Uranium Corp.*, 408 F.2d 875, 878 (10th Cir. 1969); *Singleton v. Airco, Inc.*, 80 F.R.D. 467, 470 (D.Ga.1978); *see also Telephone Workers Union v. New Jersey Bell Telephone Co.*, 584 F.2d 31 (3d Cir. 1978), also supports the original parties' position and the result reached herein.

## A. Policies Favoring Settlement.

### 1. The congressional policy favoring open housing.

■ In its decision on remand in this case, 558 F.2d 1283, 1289 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), the Seventh Circuit emphasized the strong congressional policy favoring racially integrated open housing.

The purpose of Congress in enacting the Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Second Circuit has observed that the Act was intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973). Other courts have responded to the congressional statement of policy by holding that the Act must be interpreted broadly.

558 F.2d at 1289.

The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, together with the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.*, have established a strong and unquestionable congressional intent to use every available means to limit public and private conduct which prevents racial minorities from escaping urban ghettoes and obtaining housing in the suburbs. *See Arlington Heights*, 558 F.2d at 1289; *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133–34 (2d Cir. 1973); *Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1682–83 (1978); Comment, *Applying the Title VII Prima Facie Case to Title VIII Litigation*, 11 Harv.C.R.–C.L. L.Rev. 128, 144 (1976). Since Arlington Heights and the entire northwest suburban area remain predominantly white, construction of the project envisioned by the consent decree would be a significant step toward integrating the area and would promote the congressionally mandated policies. *See Arlington Heights*, 558 F.2d at 1294.

■ An additional policy of the fair housing laws would be promoted by the entry of the consent decree. The provisions for administrative conciliation of fair housing disputes. *See Williamsburg Fair Housing Committee v. New York City Housing Authority*, 450 F.Supp. 602, 605–08 (S.D.N.Y. 1978); Chandler, *Fair Housing Laws: A Critique*, 24 Hastings L.J. 159, 184–92 (1973).

Settlement of a housing dispute by community agreement rather than by court-originated imposition of an injunctive decree upon the parties is particularly appropriate where the housing patterns of an entire community are involved. . . . The very nature of [the goal of open housing] . . . makes its achievement improbable if not impossible through the imposition upon the community of solutions not of the community's own design and thus quite likely lacking the community's support and confidence. The Court cannot force persons to live in the community; the continued or increased presence of any element of the ethnic makeup of a neighborhood, and thus the success of the Act's goal of supporting integration in the community, will depend largely on the willingness of individuals and groups to live there. . . . Thus, because the resolution of disputes by community agreement engenders the crucial community support which such solutions must have if they are to succeed, a decree developed by the community is greatly preferable to a ruling of the Court, even if such ruling be punctiliously correct on both the law and the facts. Furthermore, allowing the community groups to work out their own solution accomplishes "one of the central purposes of the Fair Housing Act of 1968 [which is] . . . to achieve harmony between the races in urban settings." *Otero v. New York City Housing Authority*, 72 Civ. 1733, at 4 (S.D.N.Y. Feb. 22, 1974) (approving consent decree negotiated following remand).

*Williamsburg Fair Housing Committee v. New York City Housing Authority*, 450 F.Supp. 602, 606 (S.D.N.Y.1978).

2. *The federal judicial policy favoring the settlement of litigation.*

■ In addition to the special policies applicable in fair housing cases, there is a general federal judicial policy favoring the voluntary settlement of litigation. This policy was recently recognized by the Court of Appeals for the Seventh Circuit in *Airline Stewards Local 550 v. American Airlines,* 573 F.2d 960, 963 (7th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).[8] *See also, e. g., Patterson v. Stovall,* 528 F.2d 108, 112 (7th Cir. 1976); *Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176 (5th Cir. 1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1972); *Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960).[9]

■ In *Airline Stewards,* the Seventh Circuit carefully set out the considerations that should govern a district court's decision to approve or reject a proposed consent decree. Accordingly, the court of appeals' opinion there has been given careful consideration by this court in its decision of this case.

*Airline Stewards* was an employment discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The plaintiffs' motion for summary judgment was granted by the district court. While the case was on appeal, the parties settled the case and submitted a proposed consent decree. The decree was entered by the district judge over the objections of an intervening union which claimed that its members' settled contractual seniority rights were being abrogated by the proposed decree.

In its opinion, the court of appeals stated that it was proper for the district court to allow the intervenor to enter the case and object to the provisions of the consent decree. 573 F.2d at 962. *See EEOC v. AT&T,* 556 F.2d 167, 173 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *United States v. Ketchikan Pulp Co.,* 430 F.Supp. 83 (D.Alas. 1977). The Seventh Circuit emphasized, however, that the intervenor's arguments were not to be judged solely on their own merits, as determined by applicable Title VII law; rather, the congressional and judicial policies favoring settlement were to be given special weight.

While we believe that in a controverted Title VII case the issues raised by the intervenor would be both difficult and interesting, we must recognize that we are here reviewing the propriety of a settlement and not a judgment rendered after a trial. We believe that the issues raised by the intervenor should not be decided on the basis of Title VII law, but rather must be decided on the basis of legal principles regulating judicial review of settlement agreements. Relying on those principles, we conclude that the district court correctly declined to decide those issues relevant to the merits of the plaintiffs' claims prior to deciding merely whether the settlement was appropriate.

. . . [I]t is generally recognized that settlements are entered into because of "the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense . . ."

Based on these considerations, this court has held that a district court in reviewing a settlement agreement "should not attempt to decide the merits of the controversy . . . [because]

---

**8.** The court in *Airline Stewards* found the general policy especially applicable to Title VII cases because of the special Title VII policy encouraging settlements. 573 F.2d at 963. *Accord, EEOC v. AT&T,* 419 F.Supp. 1022, 1039–40 (E.D.Pa.1976), *aff'd,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). This policy is analogous to the similar policy of the fair housing laws. *See* p. 845, *supra.*

**9.** The Illinois courts, as well, have recognized the strong policy in favor of settling cases. *See, e. g., Blaylock v. Toledo, Peoria & Western Railroad Co.,* 43 Ill.App.3d 35, 37, 1 Ill.Dec. 451, 453, 356 N.E.2d 639, 641 (3d Dist. 1976); *Psyhogios v. Village of Skokie,* 4 Ill.App.3d 186, 192, 280 N.E.2d 552, 556 (1st Dist. 1972).

[any] virtue which may reside in a compromise is based upon doing away with the effect of such a decision."

573 F.2d at 963 (citations omitted). *See Patterson v. Stovall,* 528 F.2d 108, 112–114 (7th Cir. 1976); *United States v. City of Jackson,* 519 F.2d 1147, 1151–52 (5th Cir. 1975); *Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960); *Williamsburg Fair Housing Committee v. New York City Housing Authority,* 450 F.Supp. 602, 606 (S.D.N.Y.1978); *United States v. American Institute of Real Estate Appraisers,* 442 F.Supp. 1072, 1083–84 (N.D. Ill.1977), *appeal dismissed for lack of jurisdiction,* 590 F.2d 242 (7th Cir. 1978).

Thus, in reviewing the intervenors' objections to the proposed settlement between MHDC and Arlington Heights, this court must follow the Seventh Circuit's ruling in *Airline Stewards* that the strong policies favoring the settlement of discrimination cases overrides any but the most powerful objections to the propriety of the consent

decree. *See also EEOC v. AT&T,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).[10, *]

### B. The Intervenors' Objections.

Against these two strong federal policies, the intervenors have advanced several legal arguments. These arguments are difficult to separate for purposes of analysis,[11] for they are closely related and many have not been directly addressed by other courts. The court will address the arguments in three general categories: attacks on the power of this court to enter the decree, objections to the procedures followed, and objections to the proposed zoning for the alternate site.[12]

### 1. The power of the court to enter the decree.

The attacks on the court's power to enter the decree are based on several different

---

**10.** The intervenors attempt to distinguish *Airline Stewards* and *EEOC* by emphasizing that both cases contained substantial records supporting a finding of a violation. In *Airline Stewards,* the district court had entered a summary judgment for the plaintiff and the case was on appeal when the consent decree was reached. 573 F.2d at 965 n. 9. In *EEOC,* a voluminous administrative record contained a large amount of evidence tending to demonstrate the illegality of AT&T's hiring practices. 419 F.Supp. at 1039. In neither case, however, were these facts dispositive. In both cases, the consent decrees contained disclaimers of liability. The broad discussions in the *Airline Stewards* opinion and the *EEOC* opinions refute the suggestion that those cases could be limited to almost-fully-litigated consent decrees.

Even if such a conclusion were reached, this case could be viewed as being in a similar posture. Without prejudging any of the issues left open by the Seventh Circuit in its remand opinion, the court notes that the court of appeals opinion shows that MHDC has gone most of the way towards establishing liability; only relatively few issues remain open to proof.

\* Subsequent to the release of this opinion, the Seventh Circuit rendered its decision in *Dawson v. Pastrick,* 600 F.2d 70, (7th Cir. 1979). In *Dawson,* the Seventh Circuit reaffirmed its holding in *Airline Stewards. Dawson* represents additional authority for the approach and results adopted here.

**11.** In organizing the intervenors' objections for analysis, the court has been forced to rearrange and recharacterize some of their arguments in order to draw out all of the issues presented. The court hopes that it has fairly described or developed all of the arguments for both sides.

**12.** Many of the intervenors' objections stem from the unusual way in which the court's powers in entering a consent decree interact with the normal procedures followed by Arlington Heights when it annexes and rezones land. The intervenors strenuously object to the overriding of these procedures. If they had been followed, Arlington Heights would have been forced to hold additional hearings prior to any action. *See* note 6 *supra.* Whatever action Arlington Heights did eventually take could have been challenged in the Illinois state courts by the intervenors. Tactically, such a challenge could succeed in delaying the project so long that it might no longer be feasible to build Lincoln Green, even if the challenge eventually failed on the merits. *Cf.* Sager, *Insular Majorities Unabated: Warth v. Seldin and City of Eastlake v. Forest City Enterprises, Inc.,* 91 Harv.L.Rev. 1373, 1384–85 (1978) (most housing discrimination suits, even those nominally successful, have failed to actually produce housing projects). Legally, the state court challenge would, according to the intervenors, allow them to vindicate their normal rights to procedural due process and guarantee a completely fair resolution of the present controversy.

grounds. First, the intervenors claim that the court of appeals' mandate in its remand opinion precludes this court from entering the decree. Next, they argue that a federal court would never have the power to enter a consent decree granting the plaintiffs the relief included here. Also, the intervenors argue that even if the relief included here could be granted under some circumstances, it cannot be granted to these plaintiffs because it is beyond the scope of their complaint.

These latter two objections are derived from the ambiguous nature of consent decrees. "Consent decrees and orders have attributes both of contracts and of judicial decrees . . . ." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n.10, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975); *Regalado v. Johnson*, 79 F.R.D. 447, 450 (N.D.Ill.1978). Arguing that a consent decree is like any other judicial decree, the intervenors suggest that the court cannot approve a consent decree and order the relief involved unless all normal requirements for the court's invocation of its equitable and legal powers are met. Specifically, they argue that the court's action must be based on a proven or admitted statutory violation and must stem from a complaint whose allegations support the relief granted.

The intervenors note that the consent decree includes a provision in which Arlington Heights specifically denies any statutory violations. No such violations have yet been proven. Of course, the Supreme Court's opinion established that there was no constitutional violation. 429 U.S. 252, 270–71, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The intervenors urge the court to conclude that this failure to demonstrate any liability prevents the court from entering the decree.

In addition, the intervenors raise two other narrow objections to the power of a federal court to enter this type of decree. First, they claim that a federal court can never enter a consent decree that abridges the preexisting rights of third parties. Second, they argue that a federal court can never order a municipality to annex and rezone land.

The intervenors' other main objection to the power of the court to enter the decree is based on the fact that the relief envisioned in the proposed consent decree, the building of a modified Lincoln Green project at a new site, is nowhere mentioned in the complaint. The plaintiffs' complaint only deals with alleged statutory violations that occurred at the original St. Viator property. MHDC never requested the Village to annex or rezone the alternate site. Accordingly, the intervenors claim that the court cannot order the entry of the consent decree, since even if the court has the power to grant some relief, it cannot grant relief that is not justified by the complaint.

### 2. *The procedural objections.*

The intervenors raise two major procedural objections. The course of conduct followed by the Village in approving the consent decree, according to the intervenors, deprived them of their rights to procedural due process because all regular procedures were not followed. They urge the court to refrain from entering the decree.

The intervenors also claim that Arlington Heights is, under Illinois law, without power to assent to the consent decree. Since Arlington Heights is bound to comply with Illinois law, and since that law requires the Village to follow its normal procedures, *see* note 6 *supra*, any official act contrary to normal procedures, such as the approval of the consent decree, is alleged to be *ultra vires* and void.

### 3. *The zoning objections.*

The intervenors' final grounds for rejecting the decree go to the merits of the proposed zoning that it includes. This zoning, the intervenors claim, would violate their rights and is clearly inequitable, if not unconstitutional. Specifically, they question the planned project's consistency with surrounding uses and claim that it would create new traffic, sewage, and drainage problems and would depreciate neighboring property values.

III. *THE POWER OF THE COURT TO ENTER THE DECREE.*

A. *The Court of Appeals Mandate Does Not Preclude the Entry of the Consent Decree.*

Before discussing the intervenors' other arguments, the court must resolve their preliminary contention that the mandate of the Seventh Circuit in its remand opinion, *see* 558 F.2d 1283 (7th Cir. 1977), prevents this court from entering the consent decree. In its decision, the court of appeals explicitly described "the procedure which the district court should follow on remand." 558 F.2d at 1294. This procedure involved three steps: determining the availability of federal funding for the project, determining whether the project would be racially integrated, and establishing whether any other suitable locations for federally subsidized housing exist in Arlington Heights. 558 F.2d at 1294–95. It concluded by remanding the case "for further proceedings consistent with this opinion." 558 F.2d at 1295.

Since the court of appeals directed this court to follow this detailed procedure, the intervenors argue that the court must follow it and cannot deviate from it. In support of their argument, the intervenors quote such judicial language as the following:

> Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; nor give any other or further relief
> . . . .

*Ex Parte Sibbald*, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838). *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); *Ex Parte Union Steamboat Co.*, 178 U.S. 317, 318–19, 20 S.Ct. 904, 44 L.Ed. 1084 (1900); *Bailey v. Henslee*, 309 F.2d 840, 843 (8th Cir. 1962) (en banc); *Mays v. Burgess*, 80 U.S.App.D.C. 236, 237, 152 F.2d 123, 124 (1945); *Monday v. United States*, 342 F.Supp. 1271, 1273 (E.D.Wis.1972); 6A

Moore's Federal Practice ¶ 59.16, at 59–294 (2d ed.).

■ The intervenors misstate the law. While it is true that an inferior court cannot question or vary the mandate of a superior court on issues actually presented to the higher court, it is free to allow additional pleadings and conduct additional proceedings in response to changed circumstances. "While a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Quern v. Jordan*, —— U.S. ——, —— n.18, 99 S.Ct. 1139, 1148 n.18, 59 L.Ed.2d 358 (1979) (quoting *Sprague v. Ticonic National Bank*, 307 U.S. 161, 168, 59 S.Ct. 777, 83 L.Ed. 1184 [1939]). "[T]he mandate would not prevent the District Court in the exercise of a sound discretion from allowing plaintiff, were adequate showing made, to file additional pleadings, vary or expand the issues and take other proceedings . . ." *Rogers v. Hill*, 289 U.S. 582, 587–88, 53 S.Ct. 731, 734, 77 L.Ed. 1385 (1933). *Accord, R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751 (10th Cir. 1975); *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 513 F.2d 151, 153 (8th Cir. 1975); *Paull v. Archer-Daniels-Midland Co.*, 313 F.2d 612, 617–18 (8th Cir. 1963); *Western Urn Manufacturing Co. v. American Pipe and Steel Corp.*, 113 U.S.App.D.C. 378, 383–84, 308 F.2d 333, 338–39 (1962); *Emmanuel v. Omaha Carpenters District Council*, 422 F.Supp. 204, 208–09 (D.Neb.1976), *aff'd* 560 F.2d 382 (8th Cir. 1977); 3 Moore's Federal Practice ¶ 15.11, at 15–150 to 15–151.

■ In interpreting the mandate of the court of appeals, this court must carefully scrutinize the accompanying opinion. *See Rogers v. Hill*, 289 U.S. at 587–88, 53 S.Ct. 731. Though only the court of appeals can authoritatively construe its own mandate, *see Bailey v. Henslee*, 309 F.2d at 843, this court, in interpreting the Seventh Circuit's opinion, does not view it as precluding any proceedings this court deems appropriate in response to changed circumstances. This is in accord with the general rule that a district court is free to order new proceed-

ings at its own discretion unless specifically precluded by the court of appeals. *See Quern v. Jordan*, —— U.S. ——, —— n.18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); 3 Moore's Federal Practice ¶ 15.11, at 15–150 to 15–151. *Cf. Cascade Natural Gas Corp. v. El Paso National Gas Co.*, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967) (where Supreme Court specifically ordered divestiture as remedy, parties had no authority to change remedy by settlement). Any settlement of this litigation which, through conciliation, provides relief equivalent to that envisioned by the court of appeals is thus clearly consistent with the decision of that court.

B. *The Relief Ordered Can Be Granted By a Federal Court in an Appropriate Case.*

 1. *A consent decree can be entered without a finding of either a constitutional or a statutory violation.*

The intervenors argue that a court cannot enter a consent decree and use its equitable powers to order relief unless it has found that the defendant has committed a constitutional or statutory violation or the defendant has admitted such a violation. Otherwise, the intervenors say, the court would be allowing the parties, through collusion, to use the court's equitable powers to take actions they could not normally take. In effect, the federal court's jurisdiction would be expanded through consent. Since no finding of liability has been made by this court and the defendants deny liability in the proposed consent decree, the intervenors claim that the decree cannot be entered.

In support of their argument, the intervenors cite the Supreme Court's decision in *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) and *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In those decisions the Court emphasized that federal courts could not order interdistrict desegregation remedies absent proof of interdistrict constitutional violations. This result, the Court said, was "based on fundamental limitations on the remedial powers of the federal courts to restructure the operation of local governmental entities. That power is not plenary. It 'may be exercised only on the basis of a constitutional violation.' " *Hills*, 425 U.S. at 293, 96 S.Ct. at 1544 (quoting *Milliken*, 418 U.S. at 738, 94 S.Ct. 3112 [quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)]). The *Hills* Court interpreted the *Milliken* decision in the following manner:

> The District Court's desegregation order in *Milliken* was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a judicial decree restructuring the operation of local governmental entities that were not implicated in any constitutional violation. [425 U.S. at 296, 96 S.Ct. 1538.]

.     .     .     .     .

> [T]he District Court's proposed remedy in *Milliken* was impermissible because of the limits on the federal judicial power to interfere with the operation of state political entities that were not implicated in unconstitutional conduct.

425 U.S. at 298, 96 S.Ct. at 1545–1547.

While this language states the general rules governing the equitable powers of the federal court, the intervenors err in assuming that those rules operate in the same way when the court is asked to approve a consent decree. The Supreme Court's decision in *Swift & Co. v. United States*, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928) still states the applicable law.

It is contended that the consent decree was without jurisdiction because it was entered without the support of facts. The argument is that jurisdiction under the Anti-Trust Acts cannot be conferred by consent; that jurisdiction can exist only if the transactions complained of are in fact violations of the Act; that merely to allege facts showing violation of the antitrust laws is not sufficient; that the facts must also be established according

to the regular course of chancery procedure; that this requires either admission or proof; and that, here, there was no admission but, on the contrary, a denial of the allegations of the bill, and a recital in the decree that the defendants maintain the truth of their answers, assert their innocence, and consent to the entry of the decree without any finding of fact, only upon condition that their consent shall not constitute or be considered an admission. The argument ignores both the nature of the injunctions . . . and the legal implications of a consent decree. The allegations of the bill not specifically denied may have afforded ample basis for a decree . . . If the court erred in finding in these allegations a basis for . . . an injunction, its error was of a character ordinarily remediable on appeal. Such an error is waived by the consent to the decree. Clearly it does not go to the power of the court to adjudicate between the parties.

276 U.S. at 327, 48 S.Ct. at 315 (citations omitted).

■ There is no indication that *Milliken* or *Hills* were meant in any way to limit the continuing validity of *Swift.* As then District Judge Higginbotham said in *EEOC v. AT&T,* 419 F.Supp. 1022, 1038 n.16 (E.D.Pa. 1976), *aff'd,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978):

[A] disclaimer of liability is, of course, a standard feature in consent decrees. The defendant denies that it has done anything wrong, then promises not to do it again. Nevertheless, it is clear that the failure of a party to a consent decree to admit liability for alleged misconduct does not affect the validity of the consent decree itself. *Swift & Co. v. United States,* 276 U.S. 311, 327, 48 S.Ct. 311, 72 L.Ed. 587 (1928). The instant defendants candidly admit that the absence of proof of actual discrimination and their denial of such discrimination are immaterial. They rightly point out that very few consent decrees would be negotiated if an admission of liability by the defendants was a *sine qua non.*

*Cf., e. g., Airline Stewards,* 573 F.2d at 963–64 (trial judge should not decide the merits of the case when approving a settlement); *Patterson v. Stovall,* 528 F.2d 108, 114 (7th Cir. 1976) (same).[13]

■ Thus, the court concludes that it can enter a consent decree absent proof or admission of a constitutional or statutory violation.

### 2. A consent decree can abridge the preexisting rights of third parties.

■ It is the intervenors' contention that a court cannot enter a consent decree that cuts off the preexisting rights of third parties. They claim that their preexisting zoning rights, based on the present zoning of the alternate site, would be violated if the court entered the proposed decree. That argument was rejected by the Seventh Circuit in *Airline Stewards Local 550 v. American Airlines,* 573 F.2d 960 (7th Cir.) (third parties claimed their seniority rights would be abridged by consent decree), *cert. denied,* —— U.S. ——, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). The court of appeals found that adoption of such a rule

would most seriously discourage efforts to settle Title VII cases, and we refuse to sanction such a result.

The only argument that intervenor offers . . . is that the district court had a duty to consider the interests of the

---

**13.** *See also EEOC v. Contour Chair Lounge Co., Inc.,* 457 F.Supp. 393, 395 (E.D.Mo.1978) (admission of liability not essential to consent agreement); *United States v. Ryan,* 360 F.Supp. 265, 269–70 (E.D.N.Y.1973) (consent waives necessity of proof) (defendant denied allegations of complaint) (injunction could not be collaterally attacked); *SEC v. Thermodynamics, Inc.,* 319 F.Supp. 1380, 1381–83 (D.Col. 1970) (same). *But cf. Detroit Police Officers* *Association v. Young,* 446 F.Supp. 979, 1009 (E.D.Mich.1978) (affirmative relief including override of preexisting rights cannot be granted in the settlement of a discrimination suit absent proof of prior discrimination); *Alaniz v. California Processors, Inc.,* 73 F.R.D. 289 (N.D.Cal. 1976) (open question); *McAleer v. AT&T,* 416 F.Supp. 435, 438 (D.D.C.1976) (open, but troubling question).

incumbent employees before approving the settlement. We have no quarrel with that general proposition, but it certainly does not lead to the conclusion that the court had a duty to litigate the merits of the plaintiffs' claims prior to approving the settlement. . . . At most the court was required to permit APFA to intervene and offer it an opportunity to present to the court its members' interests in the proposed remedy. This intervenor had an opportunity to do. The district court was required to do no more. *See EEOC v. American Tel. & Tel. Co.,* 556 F.2d 167, 173 (3d Cir. 1977) (interests of a third party in a consent decree limited to appropriateness of the remedy).

573 F.2d at 963–64 (citations omitted). *See also EEOC v. AT&T,* 419 F.Supp. 1022, 1039–40 (E.D.Pa.1976) (consent decree can cut off third party seniority rights), *aff'd,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).[14]

This court is aware that other courts have ruled to the contrary. *See Southbridge Plastics Division v. Local 759, United Rubber Workers,* 565 F.2d 913 (5th Cir. 1978); *Carson v. American Brands, Inc.,* 446 F.Supp. 780, 788 (E.D.Va.1977).[15] *Airline Stewards* establishes, however, that the law of this circuit is that a court can exercise its full equitable powers, even as against third parties, when a consent decree is filed by the original parties. Third parties whose rights may be abridged are entitled to be heard, and their views are entitled to careful consideration. They do not,

however, have an absolute right to block the entry of the consent decree.

### 3. Annexation and rezoning can be ordered by a federal court.

The intervenors have argued in their briefs that the court could never order the annexation and rezoning of land, even if the plaintiffs had proven a statutory violation at trial. This argument is based on the proposition that annexation and rezoning are legislative acts that cannot be undertaken by a court. Citing several cases, the intervenors claim that any such action would be a judicial usurpation of legislative power. *See, e. g., Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867, 878 (6th Cir. 1975), *vacated and remanded sub nom. Joseph Skilken & Co. v. City of Toledo,* 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977) (reconsideration directed in light of *Arlington Heights* and *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 [1976]), *reinstated* 558 F.2d 350 (6th Cir. 1977), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1978); *Lerner v. Town of Islip,* 272 F.Supp. 664, 665 (E.D.N.Y. 1967); *City of Miami Beach v. Weiss,* 217 So.2d 836, 837–38 (Fla.1969).

To the extent that these cases support the intervenors' position, they are not in accord with the applicable law. Even though local authorities have the primary responsibility for dealing with local matters, if local authorities fail in their affirmative obligations under federal law,

---

14. This passage of *Airline Stewards* sets up a general standard of "appropriateness of the remedy" for review of intervenors' claims in consent decree proceedings. That standard is applied by this court in evaluating the intervenors' claims that the remedy would constitute bad zoning. The standard is not applicable, however, to claims that the court has no power to enter the decree or that the Village has no power to assent to it. These objections to the court's authority to act must be dealt with on their merits. Also, the intervenors' claims that their procedural due process rights were abridged have been decided on their merits to ensure that their interests have been completely protected.

15. *See also EEOC v. Contour Chair Lounge Co., Inc.,* 457 F.Supp. 393, 395, (E.D.Mo.1978) (following *Southbridge* ); *Detroit Police Officers Association v. Young,* 446 F.Supp. 979, 1009 (E.D.Mich.1978) (affirmative relief including override of preexisting rights cannot be granted in the settlement of a discrimination suit absent proof of prior discrimination); *Alaniz v. California Processors, Inc.,* 73 F.R.D. 289 (N.D.Cal. 1976) (open question), *aff'd sub nom. Alaniz v. Tillie Lewis Foods,* 572 F.2d 657 (9th Cir.) *cert. denied,* —— U.S. ——, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *McAleer v. AT&T,* 416 F.Supp. 435, 438 (D.D.C.1976) (open, but troubling question).

judicial authority may be invoked.[16] *See Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*) (citing *Brown v. Board of Education*, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 [1955] [*Brown II*]). Furthermore, "[s]tate and federal courts deciding exclusionary zoning cases normally have the authority to grant site-specific relief." *Developments in the Law-Zoning*, 91 Harv.L.Rev. 1427, 1695 (1978). *See* Mytelka and Mytelka, *Exclusionary Zoning: A Consideration of Remedies*, 7 Seton Hall.L.Rev. 1, 26–29 (1975). *Cf. Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (congressional power to interfere with state spheres of authority is very broad when acting pursuant to the Civil War Amendments); *Caswell v. Califano*, 583 F.2d 9, 16 (1st Cir. 1978) ("no violence to the principal of separation of powers arises from judicial efforts to enforce a congressional mandate").[17] The court therefore concludes that if its power has been properly invoked

in this case, it can order site-specific affirmative relief, based on the statutory violation alleged in the complaint.[18]

## C. The Relief Granted Is Not Beyond the Scope of the Complaint.

### 1. The relief included in the consent decree must be limited to that which could be justified by a proper complaint.

The intervenors have argued that the court cannot order the relief envisioned by the consent decree because it is totally unrelated to the allegations of the complaint. Under the consent decree, Lincoln Green would be built at a site that has not previously been connected to this litigation. Arlington Heights has never refused to exercise its powers to annex and rezone this alternate site, and it is difficult to accuse it of following an actionable exclusionary zoning policy toward this particular property. Absent such an allegation, the intervenors say there is no basis for approving any

---

**16.** The court has found two cases which suggest that a federal court's broad equitable powers can only be properly invoked to remedy a constitutional violation and not a statutory violation. *Garrett v. City of Hamtramck*, 503 F.2d 1236, 1247 (6th Cir. 1974); *Park View Heights Corp. v. City of Black Jack*, 454 F.Supp. 1223, 1228 (E.D.Mo.1978). This position is refuted by cases such as *United States v. First National City Bank*, 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). *See* pp. 857–858 note 23 *infra*.

**17.** *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 777–78, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978); *Bridgeport Guardians Inc. v. Members of Bridgeport Civil Service Commission*, 482 F.2d 1333, 1340–41 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1974).

The intervenors' position is ironic in light of the fact that Illinois has provided the leading case supporting the power of state courts to order site-specific affirmative relief. *See Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill.2d 370, 167 N.E.2d 406 (1960). *See also Chicago Title & Trust Co. v. Village of Skokie*, 61 Ill.App.3d 219, 18 Ill.Dec. 617, 377 N.E.2d 1253 (1st Dist. 1978); *Mangel & Co. v. Village of Wilmette*, 115 Ill.App.2d 383, 253 N.E.2d 9 (1st Dist. 1969).

**18.** The intervenors also suggest that the provision of the relief requested in the consent de-

cree would so change the nature of this case that the four-part test for determining violations of the Fair Housing Act announced by the Seventh Circuit in the *Arlington Heights* remand opinion, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) would preclude the finding of any violation. There, the court of appeals included the nature of the desired relief as part of the balance for determining the existence of a violation. The court indicated that requiring a defendant "to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing" instead of merely ordering noninterference with the plaintiff's own land, would militate against a finding of a violation. 558 F.2d at 1293.

Admittedly, requiring annexation is somewhat more intrusive than merely enjoining interference with the plaintiff's land. The particular facts of this case, however, make that difference negligible. The plaintiff's option to buy the alternate site is similar to its option to buy the St. Viator property. Arlington Heights already has the power to annex and rezone this land, pursuant to its boundary agreement with Mount Prospect. *See* note 5 *supra*. Ordering the use of that power to add the land to the Village, then enjcining the Village from interfering with the land or, alternatively, affirmatively rezoning it, should not significantly affect the resolution of this balance.

judicial relief that would affect the property. *Cf.* Sager, *supra* note 12, at 1399 & n.91 (relief in housing discrimination cases after *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 [1975], must generally be limited to the specific parcel involved).

The court has been unable to find any reported cases that explicitly deal with this question.[19] There is language in some opinions, however, that supports the intervenors' arguments. For example, in rebutting the contention that a statutory violation must be proven or admitted before a consent decree can be entered, the Supreme Court in *Swift & Co. v. United States,* quoted at pp. 850–851 *supra,* said that "[t]he allegations of the bill not specifically denied may have afforded ample basis for a decree . . . ." 276 U.S. 311, 327, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928). The implication can be drawn that if there are no allegations to support the relief, there can be no consent decree. Similar arguments can be made from dicta in other cases. *See, e. g., SEC v. Thermodynamics, Inc.,* 319 F.Supp. 1380, 1382 (D.Col.1970) ("a consent decree, *within the purview of the pleadings and the scope of the issues,* is valid and binding upon all parties consenting") (emphasis added) (quoting *Curry v. Curry,* 65 App.D.C. 47, 48, 79 F.2d 172, 173 [1935]).

Against the cases cited above, the court must consider a second line of cases. These emphasize the broad powers of the federal courts in enforcing settlement decrees. *See, e. g., Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir. 1974); *D. H. Overmyer Co. v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *Kelly v. Greer,* 365 F.2d 669 (3d Cir. 1966), *cert. denied,* 385 U.S. 1035, 87 S.Ct. 772, 17

L.Ed.2d 682 (1967); *Cummins Diesel Michigan, Inc. v. The Falcon,* 305 F.2d 721, 723 (7th Cir. 1962). Indeed, many cases hold that a federal court can enforce a broken settlement agreement even though there is no longer any direct federal ground for relief and the action would otherwise be considered one for breach of the settlement contract. *See Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368 (6th Cir. 1976), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *McGoff v. Rapone,* 78 F.R.D. 8, 23 (E.D.Pa.1978); *Sidewinder Marine, Inc. v. Nescher,* 440 F.Supp. 680, 682 (N.D.Cal.1976). *But see Fairfax County-wide Citizens Association v. County of Fairfax,* 571 F.2d 1299 (4th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978) (court had neither inherent power nor derivative jurisdiction over breach of settlement agreement) (settlement agreement not part of original order dismissing case).

The court finds neither of these lines of cases completely controlling. Instead, it looks for guidance to *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*), discussed above, and *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*). The general equitable principles outlined in those cases indicate that a federal court's powers cannot be invoked without some violation of the constitution or a statute being admitted or proven, unless the parties have consented to the issuing of the decree. The parties' consent to the decree cannot, however, allow the court to order relief which it would not otherwise have the power to order and which the parties could not themselves otherwise contract to perform.[20] Such a result would

---

19. The court suspects that parties frequently settle cases and enter consent agreements which provide for relief not strictly justified by the complaint. Since these agreements are usually not breached, and since intervenors rarely appear to challenge their validity, courts may not have had occasion to pass upon their legality.

20. Note that if the parties could otherwise contract to do the acts ordered by the consent decree, the *Aro* case and its progeny, *supra,* indicate that the court would then have the power to approve the settlement and enter a consent decree, even if it would not otherwise have the power to enter the relief agreed upon. The parties would not need the court's powers to carry out their plans, but the court could enter the decree to end the litigation and could subsequently enforce it as part of its inherent, derivative power.

exceed the equitable limitations of *Milliken I* and would enable the parties to collusively expand the jurisdiction and power of the federal courts, in contravention of the rule that federal courts are courts of limited jurisdiction, *see generally, e. g.,* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 64–241, 309–417 (2d ed. 1973). Thus, the court holds that it cannot enter a consent decree which orders the performance of actions that the parties could not otherwise contract to perform unless the relief ordered could be granted if the plaintiff prevailed in the lawsuit.

**2. *Failure to amend the complaint is not dispositive.***

■ It is clear that the court could not order the relief included in the consent decree solely on the basis of plaintiffs' current complaint, even if the plaintiffs were to prevail at a full trial of the remaining issues. The plaintiffs' present complaint does not mention the alternate site for Lincoln Green contemplated in the consent decree. It does not present a case for relief at that site. This does not by itself, however, bar the entry of the consent decree.

After the remand of this case from the court of appeals, the plaintiffs' first step was to negotiate a settlement of this lawsuit with Arlington Heights. It would have been perfectly proper for the plaintiff, prior to the motion to approve the consent decree, to have filed an amended complaint. The prior decisions of this case by the Supreme Court and the Seventh Circuit would not have prevented the filing of an amended complaint, with leave of this court, *see* Rule 15(a), Fed.R.Civ.P., as to all issues that remained open. *See, e. g., Rogers v. Hill,* 289 U.S. 582, 587–88, 53 S.Ct. 731, 77 L.Ed. 1385 (1933); *R.E.B. Inc. v. Ralston Purina Co.,* 525 F.2d 749, 751 (10th Cir. 1975); *Western Urn Manufacturing Co. v. American Pipe and Steel Corp.,* 113 U.S.App.D.C.

378, 383–84, 308 F.2d 333, 338–39 (1962); 3 Moore's Federal Practice ¶ 15.11, at 15–150 to 15–151 (2d ed.).

■ It might have been a wiser course of action if the plaintiffs had filed an amended complaint requesting the relief included in the settlement before asking for the approval of the consent decree. The court would be emphasizing the barest technicality, however, if it refused to adopt the decree at this time because an amended complaint was not filed. *Cf.* Rule 15(b), Fed.R.Civ.P. (liberal provisions for amendment of pleadings to conform to the evidence, even after judgment). If the plaintiffs could have amended their pleadings and obtained the relief granted by the consent decree after a trial of the merits, the court will not allow their failure to amend to prevent a fair resolution of the case and the entry of the decree.

**3. *If the plaintiffs had prevailed at trial, the court could have granted the specific relief included in the consent decree.***

■ If the plaintiffs amended their complaint to include the events that have occurred in the last seven years and to request the relief granted in the consent decree, the court could have granted that relief, assuming the plaintiff prevailed at trial. In reaching this conclusion, the court holds that the general principles of equitable jurisprudence would allow the contemplated substituted remedy in this case.

The law of equitable remedies was recently restated in *Milliken II,* 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). There, the Supreme Court found that the application of equitable principles

> requires federal courts to focus upon three factors. In the first place, . . . the nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation. *Swann v.*

---

This approach would provide another basis for the entry of this consent decree if Arlington Heights had the power to annex and rezone land by consenting to the entry of the decree, without any hearing or other action by this court. *Martin v. City of Greenville,* 54 Ill. App.3d 42, 12 Ill.Dec. 46, 369 N.E.2d 543 (5th Dist. 1977) suggests that Arlington Heights does not have that power. *See* pp. 862–864 & note 29, *infra.*

*Charlotte-Mecklenburg Board of Education,* 402 U.S. [1], at 16 [91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554 (1971)]. The remedy must therefore be related to "the *condition* alleged to offend the Constitution . . . ." *Milliken I,* 418 U.S., at 738 [94 S.Ct., at 3124]. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.,* at 746 [94 S.Ct., at 3128]. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. In *Brown II* the Court squarely held that "[s]chool authorities have the primary responsibility for elucidating, assessing, and solving these problems . . . ." 349 U.S., at 299 [75 S.Ct., at 756]. (Emphasis supplied). If, however, "school authorities fail in their affirmative obligations . . . judicial authority may be invoked." *Swann, supra* [402 U.S.], at 15 [91 S.Ct., at 1276]. Once invoked, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Ibid.*

. . . . . .

The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, *see Pasadena Bd. of Education v. Spangler,* [427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599] (1976), or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation, as in *Milliken I,*

*supra. Hills v. Gautreaux,* 425 U.S. 284, 292–96 [96 S.Ct. 1538, 1543–1545, 47 L.Ed.2d 792] (1976). But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the "*condition* that offends the Constitution." *Milliken I, supra* [418 U.S.], at 738 [94 S.Ct., at 3124]. (Emphasis supplied).

433 U.S. at 280–82, 97 S.Ct. at 2757–2758. Applying the three-part test of *Milliken II* in the light of established equitable rules, this court finds that it could have granted the relief included in the consent decree if the plaintiffs had prevailed at trial.

The first part of the *Milliken II* test requires the court to determine whether the proposed annexation and rezoning "exceeds" the scope of the statutory violation; that is, whether "the remedy is tailored to cure the '*condition* that offends the . . . [statute].'" 433 U.S. at 282, 97 S.Ct. at 2758. In its remand opinion, the Seventh Circuit defined the actions of Arlington Heights that violated the statute when it stated its holding: "We hold that, if there is no land other than plaintiffs' property within Arlington Heights which is both properly zoned and suitable for federally subsidized low-cost housing, the Village's refusal to rezone constituted a violation . . . ." 558 F.2d at 1294. Thus, assuming that the defendants could not show that any other land existed that was suitable for the project, the absence of suitable land would be an essential part of demonstrating a violation. The annexation and rezoning of the alternate site would therefore cure the condition that offends the Fair Housing Act by showing that the plaintiffs were not "effectively precluded . . . from constructing low-cost housing within Arlington Heights . . . ." 558 F.2d at 1295. The Village's refusal to rezone the St. Viator site would then become immune from liability. Under these circumstances, the annexation and rezoning are an appropriate remedy tailored to cure the condition offending the statute.[21]

21. Under *Milliken II*, it is not necessary to show that every remedy adopted is directly

responsive to a specific illegal act if the remedy generally helps to remove the condition that is

The second requirement of the *Milliken II* test is that the decree "indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" 433 U.S. at 280, 97 S.Ct. at 2757 (citing *Milliken I,* 418 U.S. at 746, 94 S.Ct. 3112). The victims of discriminatory conduct, MHDC and the prospective tenants of Lincoln Green, wanted to build the Lincoln Green project in Arlington Heights. There is no indication that the specific location of the project within the Village mattered. Furthermore, in the last seven years, the considerable changes in the housing market and in applicable economic, political, and social conditions have apparently convinced the plaintiffs that the alternate site would be a better location for the project. The relief ordered by the consent decree would, to the greatest extent possible at this time, eventually put the plaintiffs in the position they would have occupied if the assertedly illegal action had not occurred.

Finally, *Milliken II* requires that the court consider the interests of Arlington Heights in managing its own affairs. As has already been discussed, *see* pp. 852-853 *supra,* the court would have the power after a trial to order the annexation and rezoning of the alternate site. Since the Village of Arlington Heights has agreed to these steps as part of the consent decree, the court finds that the remedy is non-intrusive and that this *Milliken II* requirement has been fully served.

Thus, assuming that the plaintiffs could demonstrate that the building of Lincoln Green at the alternate site would be the best way of erasing the effects of the allegedly illegal actions of the Village of Arlington Heights, *Milliken I* and *Milliken II* would not prevent the entry of the requested decree.

Furthermore, the court finds that the annexation and rezoning of the alternate site are entirely in accord with the traditional flexibility and scope of equitable remedies.[22] As the Supreme Court said in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):

Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30 [64 S.Ct. 587, 592, 88 L.Ed. 754] (1944).

illegal and does not exceed the scope of the violation. *Evans v. Buchanan,* 582 F.2d 750, 769 (3d Cir. 1978) (en banc), *cert. docketed,* Nos. 78 671, 78-672, 47 U.S.L.W. 3303 (Oct. 20, 1978). See *Milliken II,* 433 U.S. at 281, 97 S.Ct. 2749 (ancillary remedies including compensatory programs are acceptable); *Bagby v. Beal,* 455 F.Supp. 881, 891 (M.D.Pa.1978) (once violation found, broad equitable powers allow the court to fashion an effective remedy, even if by itself the remedy is not constitutionally required); *Parent Association of Andrew Jackson School v. Ambach,* 451 F.Supp. 1056, 1078 (E.D.N.Y.1978) (same).

Also, the fact that the remedy would require Arlington Heights to annex land outside of its current municipal limits does not violate *Millik-en*'s proscription of interdistrict remedies for intradistrict violations. *Hills* clearly allowed remedies that ordered a governmental body to use its interdistrict powers to remedy its own illegal acts. *See* 425 U.S. at 300, 96 S.Ct. 1538; *Berry v. School District of Benton Harbor,* 467 F.Supp. 695 at 703–704 (W.D.Mich.1978).

22. *See, e. g., Hutto v. Finney,* 437 U.S. 678, 688, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978); *Preston v. Thompson,* 589 F.2d 300, 303 (7th Cir. 1978); *Ives v. W. T. Grant Co.,* 522 F.2d 749 (2d Cir. 1975); *Johnson v. Capital City Lodge No. 74,* 477 F.2d 601, 603 (4th Cir. 1973); *Battle v. Anderson,* 457 F.Supp. 719, 734–35 (E.D.Okl.1978); *Bagby v. Beal,* 455 F.Supp. 881, 891 (M.D.Pa.1978).

██ The annexation and rezoning are also supported by the equitable doctrine that the existence of a statutory right normally implies the existence of all necessary and appropriate remedies, *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Collin v. O'Malley,* 452 F.Supp. 577, 579 (N.D.Ill.1978), and by the rule that courts of equity will go further in granting relief when acting in furtherance of the public interest and/or a congressionally mandated policy, *United States v. First National City Bank,* 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).[23] As discussed above, Congress has established a statutory right to open housing, and has made the achievement of that right a national policy. *See* p. 845, *supra.* Thus, annexation and rezoning are particularly appropriate here. In entering this consent decree, the court is not providing the plaintiffs with greater relief than they could have obtained if they had prevailed at trial.

## IV. THE PROCEDURES FOLLOWED ARE VALID.

### A. Procedural Due Process Guarantees Have Been Met.

Arlington Heights did not follow normal annexation and zoning procedures in this case. *See* note 6 *supra.* Instead, it entered into negotiations for the consent decree, informing the court on June 22, 1978, that it had tentatively agreed to the entry of the decree. After Mount Prospect moved to intervene on June 30, 1978, Arlington Heights scheduled an open meeting for July 5. At that meeting, the Board of Trustees received public comment on the proposed

**23.** The rules in this area were recently restated by the Court of Appeals for the Ninth Circuit in *United States v. Coca-Cola Bottling Co. of Los Angeles,* 575 F.2d 222, 228–29 (9th Cir. 1978):

The equity jurisdiction of the federal courts traditionally has permitted the fashioning of broad and flexible decrees molded to the necessities of the individual case. Particularly, when equity jurisdiction has been invoked to enforce federal statutory prohibitions, the Supreme Court repeatedly has recognized the power of the equity court to mold the necessary decrees to give effect to congressional policy. *See, e. g., United States v. First Nat. City Bank,* 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). In such cases "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *United States v. First Nat. City Bank, supra,* 379 U.S. at 383, 85 S.Ct. at 531, citing with approval *Virginia Railroad Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

*Porter v. Warner Holding Company, supra,* is an instructive example. There the Supreme Court was concerned with the power of a federal court, in an enforcement proceeding . . . . .

Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. [Citation omitted.] Power is thereby resident in the District Court, in exercising this jurisdiction, "to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754. It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice. [Citation omitted].

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command."

*Porter v. Warner Holding Co., supra,* 328 U.S. at 398, 66 S.Ct. 1089.

*See also Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211 at 1222–1223 (7th Cir. 1979).

decree. The board heard the comments, then approved the consent agreement.

The intervenors claim that this abrogation of normal procedures abridged their rights to procedural due process. They claim the one hearing the Village actually held was an inadequate substitute for those procedures. The original parties respond that the intervenors' rights were fully honored by the Village and by this court.

### 1. The intervenors are entitled to some procedural due process protection.

"The fundamental requisite of due process of law is the opportunity to be heard." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (quoting *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 [1914]). Over the years, courts have developed various procedural requirements to guarantee that this right is effectuated.

> The procedural requirements themselves are relatively clear; where individual rights to procedural due process are implicated by zoning actions they normally include the right to notice and a hearing, and the right to an impartial decision-maker which renders its decision with reference to articulable standards. But the courts have not as yet provided any systematic analysis of the circumstances in which these procedural requirements are applicable to zoning actions.

*Developments in the Law—Zoning,* 91 Harv.L.Rev. 1427, 1501–02 (1978) [hereinafter cited as *Developments*].

■ The starting point for analyzing whether procedural due process rights apply is determining whether the intervenors had a sufficient property interest under Illinois law to give rise to federal due process protection. See *Leis v. Flynt,* —— U.S. ——, ——, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Under the circumstances of this case, the resolution of that question turns on whether the challenged decision was "administrative" or "legislative." Normally, procedural due process rights are only applied to administrative decisions.[24] *See, e. g., Pickus v. United States Board of Parole,* 177 U.S.App.D.C. 93, 97, 543 F.2d 240, 244 (1976); *Developments,* 91 Harv.L. Rev. at 1503, 1508–09.[25] It is very difficult in zoning decisions, however, to decide which actions are legislative and which are administrative. *Developments,* 91 Harv.L. Rev. at 1508; see *Ward v. Village of Skokie,* 26 Ill.2d 415, 424–25, 186 N.E.2d 529, 533 (1962) (Klingbiel, J., concurring in the judgment).

In the past, courts have used several tests in attempting to distinguish administrative and legislative zoning decisions. Some courts have looked merely to the nature of the decisionmaking body, and have found that if elective bodies such as city councils act, their acts are necessarily legislative. Others base their classification on the nature of the decision made, calling the adoption of a comprehensive plan legislative, but the granting of a variance administrative. Still others have attempted to distinguish the creation of general policy from the application of preexisting policy to particular cases. *Developments,* 91 Harv.L. Rev. at 1509.

■ The Illinois courts have repeatedly referred to zoning, see, e. g., *LaSalle Na-*

---

24. Due process is limited to nonlegislative actions in part because of practical concerns of administrability. A constitutional right to procedural due process for every person affected by legislation would entail procedures so cumbersome as to make government action impossible. More importantly, due process need not attach to legislative acts because the large number of people affected by most legislative acts normally ensures that government will not act unreasonably towards the populace. Legislators will usually attempt to represent the views of their constituents accurately, and, if they do not do so, the electoral process provides recourse. *Developments,* 91 Harv.L.Rev. at 1508–09.

25. *But see* L. Tribe, American Constitutional Law, §§ 17–1 to 17–3 (1978) (arguing that procedural due process rights should also be applied to legislative decisions); Linde, *Due Process of Lawmaking,* 55 Neb.L.Rev. 197 (1976) (same); Sager, *supra* note 12 (same); Tribe, *Structural Due Process,* 10 Harv.C.R.–C.L. L.Rev. 269 (1975) (same).

tional Bank v. City of Evanston, 57 Ill.2d 415, 428, 312 N.E.2d 625, 632 (1974), and annexation, see Citizens for a Better Bloomingdale v. Village of Bloomingdale, 37 Ill.App.3d 583, 586, 346 N.E.2d 5, 7 (2d Dist. 1976); New-Mark Builders, Inc. v. City of Aurora, 90 Ill.App.2d 98, 101, 233 N.E.2d 44, 46 (2d Dist. 1968),[26] as legislative acts. Furthermore, there can be no question, in light of the history of this litigation, that the board's decision in approving the consent agreement was based on general policy considerations involving the proper role of the Village in providing low and moderate-income racially integrated housing and on the Village's desire to end the litigation. See Transcript, September 25, 1978, at 15.[27] These factors suggest that the court should conclude that the Village's decision to consent to the annexation and rezoning was a legislative decision, not limited by procedural due process requirements.

■ This court is unwilling to rule, however, that the intervenors are not entitled to any procedural due process rights. The interests involved are too important, and the special effects of the litigation on their land could conceivably be too great, to allow such a result. The intervenors should be entitled to some procedural due process protection.

This conclusion is supported by the analysis of procedural due process rights in zoning cases suggested in Developments, supra. That analysis focuses on the purposes of procedural due process: promoting efficiency, representation, and the dignity of the individual. Developments, 91 Harv.L.Rev. at 1505; see Subrin and Dykstra, Notice and the Right to Be Heard: The Significance of Old Friends, 9 Harv.C.R.–C.L. L.Rev. 449, 460 (1974). It suggests a two-part test for determining the type of decision involved. First, Developments suggests, the court should look to see whether

the decision involves legislative facts, those that are generally applicable, or whether it involves administrative facts, those which relate with greater specificity to particular individuals or situations. Developments then suggests that a court should see whether the decision, even though it appears to be of sufficient generality to be legislative, has such a differentiable impact on specific individuals that they should be entitled to due process protection. 91 Harv. L.Rev. at 1510–20.

The Village's decision to settle the litigation clearly falls into this latter category. The intervenors have a legal interest in the annexation and rezoning of the neighboring land. See Anundson v. City of Chicago, 44 Ill.2d 491, 256 N.E.2d 1 (1970); Forestview Homeowners Association, Inc. v. County of Cook, 18 Ill.App.3d 230, 309 N.E.2d 763 (1st Dist. 1974). See also Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861 (8th Cir. 1977); Wolpe v. Poretsky, 79 U.S.App.D.C. 141, 144 F.2d 505 (1944). But see Dodson v. Salvitti, 77 F.R.D. 674 (E.D.Pa.1977). The policy considerations that are at the heart of the procedural due process doctrine require that the intervenors' interest receive some procedural due process safeguards.

2. The intervenors received all process that was due.

■ The court must next determine the nature of the required safeguards. The Supreme Court has noted:

"Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. [471], at 481 [92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484 (1972)]. We turn to that question, fully realizing as our cases regularly do that the interpretation and application of the Due Process Clause are intensely practical matters and that

26. Annexation can also, under some statutory provisions, see Ill.Rev.Stat. ch. 24, § 7–1–4, be a judicial act. See Town of Richwoods v. City of Peoria, 80 Ill.App.2d 359, 365, 225 N.E.2d 48, 52 (3d Dist. 1967).

27. The power to conduct and settle litigation is a general power of the Village, see e. g., Ammann v. Dipper, 392 Ill. 38, 43–44, 63 N.E.2d 870, 873 (1945), which is clearly legislative in nature.

"[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961).

*Goss v. Lopez,* 419 U.S. 565, 577–78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). *See Board of Curators v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

The general principles for determining "what process is due" in administrative proceedings are applicable for deciding what process is required here. These principles were stated by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court reviewed the prior cases and held that

" '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy, supra,* [416 U.S. 134] at 167–168 [94 S.Ct. 1633, at 1650–1651, 40 L.Ed.2d 15 (1974)] (Powell, J., concurring in part); *Goldberg v. Kelly, supra,* [397 U.S. 254] at 263–266 [90 S.Ct. 1011, at 1018–1020, 25 L.Ed.2d 287 (1970)]; *Cafeteria Workers v. McElroy, supra,* 367 U.S. at 895 [81 S.Ct., at 1748–1749]. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedure would entail. *See, e. g., Goldberg v. Kelly, supra* [397 U.S.], at 263–271 [90 S.Ct., at 1018–1022].

424 U.S. at 334–35, 96 S.Ct. at 902–903. *See Wright v. Califano,* 587 F.2d 345, 355 (7th Cir. 1978). *See generally* Note, *Specifying the Procedures Required by Due Process: Toward Limits on the Use of Interest Balancing,* 88 Harv.L.Rev. 1510 (1975).

■ The first factor involved is the degree of potential deprivation that will be suffered by the intervenors. *See Mathews v. Eldridge,* 424 U.S. at 341, 96 S.Ct. 893. If the intervenors' objections are justified, *but see* pp. 864–866 *infra,* this may amount to a significant diminution of the value of their property. While this diminution is not life threatening, *cf. Goldberg v. Kelly, supra,* and would not amount to a total destruction of the property, it should be entitled to some protection.

■ The second factor is the risk of an erroneous deprivation of the intervenors' interests under the procedures which have already been followed and the increased benefits, if any, that they would receive from additional proceedings. The procedures followed, of course, have included a full hearing in this court on the merits of their objections to the annexation and rezoning. The intervenors were allowed to present extended testimony and given full trial rights. Moreover, they have the right of appeal if they disagree with this court's findings. Under these circumstances, the court cannot say that any additional procedural requirements, such as the additional Village hearings and right of appeal to the state courts desired by the intervenors, would have substantially affected the accuracy of the truth-finding process. They would not have significantly reduced the risk of error. *See Mathews v. Eldridge,* 424 U.S. at 343–45, 96 S.Ct. at 909.

■ "In striking the appropriate due process balance the final factor to be as-

sessed is the public interest. This includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right," the additional proceedings desired by the intervenors. *See Mathews v. Eldridge,* 424 U.S. at 347, 96 S.Ct. 893. In this case, the balance weighs heavily against the requested procedures. The cost to the public of the additional hearings would be significant. *See Mathews v. Eldridge,* 424 U.S. at 347–48, 96 S.Ct. 893. The cost to MHDC in submitting itself to additional hearings, then building the project at some unspecified date in the future would be substantial, especially considering the current high rate of inflation. Also, the public interests in open housing and the compromise of litigation might well be defeated by such an extended delay. *See* pp. 844–847 & note 12 *supra.* Finally, separating out the approval of the annexation and the rezoning from the rest of this litigation would defeat the general federal policy favoring the settlement of legal controversies in whole, and not through multiple litigation. *See Federal Resources Corp. v. Shoni Uranium Corp.,* 408 F.2d 875, 878 (10th Cir. 1969); *Singleton v. Airco, Inc.,* 80 F.R.D. 467, 470 (D.Ga.1978). *See also Telephone Workers Union v. New Jersey Bell Telephone Co.,* 584 F.2d 31 (3d Cir. 1978).

Thus, after analyzing the relevant factors, this court concludes that the intervenors received exactly the process to which they were entitled: a full hearing on the merits of their claims in this court.[28] *Cf. Airline Stewards Local 550 v. American Airlines,* 573 F.2d 960, 963–64 (7th Cir.) (interests of third party in consent decree limited to the propriety of the remedy), *cert. denied,* —— U.S. ——, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *EEOC v. AT&T,* 556 F.2d 167, 173 (3d Cir. 1977) (same), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).

**B.** *Arlington Heights Had the Authority to Assent to the Decree.*

The intervenors' most serious and troubling objection is that the Village of Arlington Heights is totally without power to agree to the proposed consent decree. In their argument, the intervenors rely upon *Martin v. City of Greenville,* 54 Ill.App.3d 42, 12 Ill.Dec. 46, 369 N.E.2d 543 (5th Dist. 1977). *Cf. Suski v. Mayor of Beach Haven,* 132 N.J.Super. 158, 162–164, 333 A.2d 25, 28–29 (App.Div.1975) (reaching similar result); *Midtown Properties, Inc. v. Township of Madison,* 68 N.J.Super. 197, 205–207, 172 A.2d 40, 45–46 (1961) (reaching similar result), *aff'd.* 78 N.J.Super. 471, 189 A.2d 226 (App.Div.1963). *See also Allender v. City of Chicago Zoning Board of Appeals,* 63 Ill.App.3d 204, 211, 21 Ill.Dec. 69, 75, 381 N.E.2d 4, 10 (1st Dist. 1978) (questioning power of zoning board of appeals to add conditions not authorized by statute to compromise of zoning claims). In *Martin* the Illinois Appellate Court, Second District, held that a non-home rule municipality cannot settle litigation involving its zoning ordinances in a manner that would require it to take any actions inconsistent with normal zoning procedural requirements.

■■ The *Martin* argument is based on the following premises. Under Illinois law, a municipality cannot be bound by a contract in which it has exceeded its powers; such a contract is *ultra vires. McGovern v. City of Chicago,* 281 Ill. 264, 118 N.E.3d (1917); *Stahelin v. Board of Education,* 87 Ill.App.2d 28, 230 N.E.2d 465 (2d Dist. 1967); *Allen v. Treat,* 72 Ill.App.2d 466, 218 N.E.2d 250 (4th Dist. 1966); *Wacker-Wabash Corp. v. City of Chicago,* 350 Ill.App. 343, 112 N.E.2d 903 (1st Dist. 1953). Since a person dealing with a municipality is charged with knowledge of any limitations on its authority to enter into contracts, *May v. City of Chicago,* 222 Ill. 595, 78 N.E. 912 (1906); *Wacker-Wabash Corp. v. City of Chicago, supra,* a consent decree,

---

**28.** Note that the Village Board's participation in the settlement negotiations did not make it an improper body for deciding the merits of the annexation and zoning aspects of the settlement. *See Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 494, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

insofar as it is analagous to a contract, *see* p. 848 & note 20 *supra,* is void if it cannot be lawfully agreed to by the municipality. Since, in *Martin,* the municipality was bound by Illinois law to follow certain procedures when it rezoned land, *see Hanrahan v. Village of Wheeling,* 42 Ill.App.3d 825, 828, 1 Ill.Dec. 524, 527, 356 N.E.2d 806, 809 (1st Dist. 1976); *City of Des Plaines v. Village of Mount Prospect,* 29 Ill.App.3d 807, 813, 331 N.E.2d 373, 378 (1st Dist. 1975); *Cain v. American National Bank & Trust Co. of Chicago,* 26 Ill.App.3d 574, 582, 325 N.E.2d 799, 806 (1st Dist. 1975); *Marre v. Countryside Sanitary District,* 5 Ill. App.3d 747, 751, 284 N.E.2d 308, 312 (1st Dist. 1972), and these procedures would be abrogated if the land were rezoned pursuant to the judicial consent decree, the appellate court ruled that the municipality was powerless to agree to the consent decree. The decree was held to be void. *See Martin v. City of Greenville,* 54 Ill.App.3d at 45–46, 12 Ill.Dec. at 48–49, 369 N.E.2d at 545–46.

■ First, this court notes that it is not bound to accept the *Martin* decision as an accurate statement of Illinois law. Only decisions of the Illinois Supreme Court are binding on federal courts as interpretations of Illinois law. A federal court can disregard intermediate appellate court rulings if there is sufficient reason for doing so. *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Oberman v. Dun & Bradstreet, Inc.,* 586 F.2d 1173, 1176–77 & n.2 (7th Cir. 1978) (Swygert, J., dissenting); *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 606–07 (7th Cir. 1975); *Hockett v. American Airlines, Inc.,* 357 F.Supp. 1343, 1345 (N.D.Ill.1973).

■ This court is satisfied that *Martin* is a correct statement of Illinois law where the settlement of a zoning suit would affect the rights of third parties without giving them an opportunity to be heard.[29] The

29. There is a substantial argument that *Martin* could be distinguished because it should not apply to a home rule municipality such as Arlington Heights. Under the new Illinois Constitution of 1970, Article VII, Section 6(a), Arlington Heights and other home rule municipalities were given powers far greater than Illinois municipalities previously possessed. Section 6(a) specifically allows home rule units to "exercise any power and perform any function pertaining to its government and affairs, including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare . . . ." Section 6(m) states that the new home rule powers are to be "liberally construed." See *Coryn v. City of Moline,* 71 Ill.2d 194, 15 Ill.Dec. 776, 778, 374 N.E.2d 211, 213 (1978); *City of Urbana v. Houser,* 67 Ill.2d 268, 273, 10 Ill.Dec. 239, 241, 367 N.E.2d 692, 694 (1977).

The concept of home rule adopted under the provisions of the 1970 constitution was designed to drastically alter the relationship which previously existed between local and State government. Formerly, the actions of local governmental units were limited to those powers which were expressly authorized, implied or essential in carrying out the legislature's grant of authority. Under the home-rule provisions of the 1970 constitution, however, the power of the General Assembly to limit the actions of home-rule units has been circumscribed and home-rule units have been constitutionally delegated greater autonomy in the determination of their

government and affairs. To accomplish this independence the constitution conferred substantial powers upon home-rule units subject only to those restrictions imposed or authorized therein.

*Kanellos v. County of Cook,* 53 Ill.2d 161, 166, 290 N.E.2d 240, 243 (1972).

Since the conduct and settlement of litigation is normally a governmental power, *see Psyhogios v. Village of Skokie,* 4 Ill.App.3d 186, 192, 280 N.E.2d 552, 556 (1st Dist. 1972); *Mangel & Co. v. Village of Wilmette,* 115 Ill.App.2d 383, 396, 253 N.E.2d 9, 15 (1st Dist. 1969), it could be argued that *Martin* does not extend to home rule units and that Arlington Heights accordingly has full legal power to agree to the proposed decree. *Cf. Ampersand, Inc. v. Finley,* 61 Ill.2d 537, 540, 338 N.E.2d 15, 17 (1975) (right of home rule unit to exercise power ultimately depends on interpretation by the Supreme Court of the constitutionality of the use of that power).

There is, however, another complication. The Illinois Supreme Court has specifically held that home rule municipalities cannot exercise extraterritorial governmental powers absent the consent of the legislature. *City of Carbondale v. Van Natta,* 61 Ill.2d 483, 485, 338 N.E.2d 19, 21 (1975); *City of Salem v. McMackin,* 53 Ill.2d 347, 374, 291 N.E.2d 807, 823 (1972); *see* Shick, *Illinois Home Rule in the Courts—Continued,* 65 Ill.Bar.J. 214, 215–18 (1976). *Cf.* Baum, *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict,*

court does not believe, however, that the Illinois Supreme Court would formalistically apply the *Martin* holding under the facts of this case. In *Martin*, third parties who might have been affected by the proposed zoning changes were never brought before the court. The only method available to protect their interests was to void the settlement, for the municipality was impairing its duty to the third parties by attempting to settle the case without giving them any opportunity to be heard. Here, Mount Prospect and the other intervenors were given a full hearing on the merits of their objections to the proposed annexation and rezoning. *Cf. International Society For Krishna Consciousness, Inc. v. City of Evanston*, 53 Ill.App.3d 443, 11 Ill.Dec. 93, 368 N.E.2d 644 (1st Dist. 1977) (hearing not required to extend special use permit). Requiring additional hearing before the Village authorities, with appeals to the Illinois state courts afterwards would, as noted *supra*, p. 862, defeat the strong federal policies favoring the compromise of litigation, fair housing, and the resolution of disputes in one forum, whenever possible.

■ To apply *Martin* to the facts of this case would be to separate its holding from the rationale for its existence. As Mount Prospect itself stated in its brief, "procedural due process considerations underlie the . . . rule" of *Martin*. Intervenor-Defendant Village of Mount Prospect's Trial Memorandum, September 25, 1978, at 11–12. The intervenors' procedural due process rights have been fully satisfied. *See* pp. 859–862, *supra*. Thus, to separate the statutory procedural rights asserted by the intervenors and recognized in *Martin* from the procedural due process and substantive rights they were meant to protect would

not be sensible. It would be inconsistent with the rule that the protection of procedural rights represented by due process "is not a technical conception with a fixed conduct unrelated to time, place and circumstances," *Mathews v. Eldridge*, 424 U.S. at 334, 96 S.Ct. at 902 (quoting *Cafeteria Workers*, 367 U.S. at 895, 81 S.Ct. 1743), but rather "is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, 96 S.Ct. at 902 (quoting *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593).[30] This court is convinced that the Illinois Supreme Court would not require such a result.

## V. THE INTERVENORS' ZONING OBJECTIONS.

The intervenors have raised several objections to the zoning of the subject property included in the consent decree. The most substantial objections are: that the character of the land use is inconsistent with that of surrounding uses, that the increased traffic caused by the project would be substantial and unreasonable, that there would be no facilities to handle the sewage generated by the project, that the project provides inadequate facilities for storm water runoff, and that the project would substantially depreciate the value of neighboring property.

### A. The Proper Standard of Review.

Before discussing the merits of these objections, the court must determine the proper standard of review for these claims. Three standards could be applicable. The court could apply the deferential rational relation test normally used in federal review of zoning claims. *See Village of Belle*

---

1972 U.Ill.L. Forum 559, 582 n.65 (home rule powers should not include annexation). *See also Landry v. Smith*, 66 Ill.App.3d 616, 618–20, 23 Ill.Dec. 636, 638–39, 384 N.E.2d 430, 432–33 (1st Dist. 1978). Although a distinction may exist between using home rule powers to directly annex land and using home rule powers to settle a lawsuit which leads to the annexation of land, *cf. Psyhogios v. Village of Skokie*, 4 Ill.App.3d 186, 280 N.E.2d 552 (1st Dist. 1972) (contract settling zoning case is valid), this

court is not prepared to rest its holding on that distinction.

**30.** The court is also influenced by the fact that it was the intervenors who requested three days of the court's time for a hearing on the merits of their zoning objections. Even though no question of waiver or estoppel is involved, the court feels that this shows an implicit recognition by those parties that this is an appropriate forum for resolving their claims.

*Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *City of Highland Park v. Train*, 519 F.2d 681, 696–97 (7th Cir. 1975), *cert. denied*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976). It could also apply the standard used by Illinois courts, which will set aside a zoning ordinance only if it is clearly unreasonable. *See, e. g., Duggan v. County of Cook*, 60 Ill.2d 107, 111–12, 324 N.E.2d 406, 408–09 (1975); *LaSalle National Bank v. City of Evanston*, 57 Ill.2d 415, 428–29, 312 N.E.2d 625, 632 (1974); *Georgen v. Village of Mount Prospect*, 65 Ill. App.3d 512, 519–20, 22 Ill.Dec. 203, 209–10, 382 N.E.2d 523, 528–29 (1st Dist. 1978). Finally, the court could apply the general standards of fairness and equity which are usually applied in evaluating the propriety of the settlement of a case. *See Airline Stewards Local 550 v. American Airlines*, 573 F.2d 960, 963 (7th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), pp. 846–847 & note 10 *supra*.

█ Under either of the first two tests, the court would have to determine which zoning decision is entitled to the deferential review: the current zoning of the property or the zoning contemplated by the consent decree.[31] The intervenors claim that the current zoning is entitled to the deferential approach described in the cases cited above.

They suggest that the original parties must show that that zoning is unreasonable. *See Forestview Homeowners Association, Inc. v. County of Cook*, 18 Ill.App.3d 230, 243–44, 309 N.E.2d 763, 773–76 (1st Dist. 1974) (change in zoning only appropriate where public welfare requires it). The original parties, on the other hand, argue that the Arlington Heights Village Board's acceptance of the consent decree was the legislative act, *see* pp. 859–860, *supra*, that was entitled to deference. *See Zilien v. City of Chicago*, 415 Ill. 488, 492–93, 114 N.E.2d 717, 719 (1953) (presumption of legislative validity belongs to the rezoning ordinance, not the original zoning); *Siegel v. City of Chicago*, 127 Ill.App.2d 84, 96–97, 261 N.E.2d 802, 806–07 (1st Dist. 1970) (same).

█ The court need not resolve this dispute. As discussed at pp. 846–847 & note 10 *supra*, the third standard is applicable here. The interests of the intervenors in this action are limited to the propriety of the remedy. *Airline Stewards*, 573 F.2d at 963–64. It is true that the court has allowed the intervenors to attack the power of this court to enter the decree and the legality of the procedures followed by Arlington Heights. Those issues, which go to the very power of the court and the parties to act in this matter, have been decided on their merits. The intervenors' attack on

31. In Illinois, zoning ordinances have a presumption of validity.

Before a court will intervene it must be established by clear and convincing evidence that the ordinance, as applied to plaintiffs, is arbitrary and unreasonable and has no substantial relation to the public health, safety or welfare. These rules are based upon a recognition that zoning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare. Where it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive. In *LaSalle National Bank of Chicago v. Cook County*, 12 Ill.2d 40, 145 N.E.2d 65, we reviewed the considerations determining the validity of an ordinance as applied to a particular property and stated that "among the facts which may be taken into consideration in determining the validity of the ordinance are the following: (1) The existing uses and zoning of nearby property, (2) the extent to which property values are diminished by the particular zoning restrictions, (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, (5) the suitability of the subject property for the zoned purposes, and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. *LaSalle National Bank v. City of Evanston*, 57 Ill.2d 415, 428–29, 312 N.E.2d 625, 632 (1974) (citations omitted). The federal cases cited in the text grant a similar deference.

the zoning contemplated by the decree, however, is precisely the type of issue that the Seventh Circuit in *Airline Stewards* held "must be decided on the basis of legal principles regulating judicial review of settlement agreements." 573 F.2d at 963. Thus, the court will scrutinize the proposed zoning to ensure that it is fair and appropriate.

### B. *The Specific Objections.*

#### 1. *Consistency with surrounding uses.*

■ The intervenors have urged that the project contemplated by the consent decree would be inconsistent with the single-family housing neighboring the site and is therefore unreasonable. Illinois courts have recognized this as a valid zoning consideration. "In determining the validity of zoning restrictions, a paramount consideration is the extent to which the zoning of the subject property conforms with surrounding existing uses and whether the surrounding uses are uniform and established." *Georgen v. Village of Mount Prospect*, 65 Ill. App.3d 512, 520, 22 Ill.Dec. 203, 209, 382 N.E.2d 523, 529 (1st Dist. 1978) (citing *Ryan v. County of DuPage*, 28 Ill.2d 196, 198, 190 N.E.2d 737 [1963]).

The parties presented a great deal of testimony and numerous exhibits in their efforts to convince the court that the proposed zoning is or is not compatible with present neighboring uses. The court has carefully considered all of the evidence submitted and finds that the original parties have conclusively demonstrated that the proposed zoning is compatible with existing uses.

Only three points of evidence presented by the intervenors strongly suggest the incompatibility of the uses. These points are the neighboring single-family properties, the conflict between the consent decrees and the Arlington Heights and Cook County comprehensive plans, and the opinion testimony of Mr. H. Thomas Murphy, a

planning and zoning consultant called by Mount Prospect. All of these points were successfully refuted by the original parties.

The exhibits entered into evidence and the testimony of the witnesses indicate that 80% of the perimeter of the subject property is currently zoned for single-family residences.[32] Almost all of the area north of Golf Road in the vicinity of the property is currently occupied and/or zoned for single-family use. As indicated by William McCann, an expert real estate appraiser who testified for Arlington Heights, nothing is more compatible with single-family housing than other single-family housing.

Mr. McCann also testified, however, that many other land uses are compatible with single-family housing; all single-family housing cannot be surrounded on all sides by other single-family housing. The use planned for the subject property follows a natural zoning progression from more intensive to less intensive uses: arterial road, commercial use, multiple-family housing, single-family housing. Rolf C. Campbell, a city planning and zoning consultant called by Arlington Heights, testified that the Di-Mucci Corp. development, which is located near the subject property along Golf Road, also uses this same progression. He added that there are many instances of single-family residences adjoining multiple-family units within two miles of the subject property. Indeed, there is other multiple-family housing within 600 feet of the site. Thus, the intervenors failed to prove that there is a "uniform and established" use surrounding the subject property.

■ The intervenors presented evidence that both the Cook County and the Arlington Heights comprehensive plans indicate that the subject property should be developed as part commercial and part single-family. They argued that any other development would be inconsistent with the surrounding uses.[33] Mr. Campbell, who was a consultant from 1973 to 1976 in the prepa-

---

32. There is no guarantee that all of the property currently zoned for single-family residences will actually be developed that way. *See* p. 867 *infra.*

33. The intervenors contend that the fact that the proposed zoning of the subject property is inconsistent with the comprehensive plans itself demonstrates the unreasonableness of the

ration of the comprehensive plan, and Joseph Kelser, the Village Planner of Arlington Heights, who was responsible for preparation of the most recent Village comprehensive plan, both testified that the single-family classification assigned to part of the subject property was a "holding zone." They said that single-family classification is frequently assigned to undeveloped property with the expectation that when a developer asks to improve the land, the developer will negotiate a more intensive land use with the appropriate zoning authority. In other words, the classification of property as single-family residential in the comprehensive plan is an uncertain indication that the property will be developed that way. Thus, a zoning decision inconsistent with the comprehensive plan does not make the rezoned property inconsistent with surrounding uses.

Finally, the intervenors presented Mr. Murphy as an expert planning and zoning consultant. He testified that the proposed use was highly unreasonable and inconsistent with other uses in the vicinity. Mr. Murphy's testimony was impeached, however, by prior statements he had made that favored similar projects built in similar circumstances. The court did not consider Mr. Murphy's testimony to be highly credible. Furthermore, Mr. McCann and Mr. Campbell, both expert witnesses, presented credible testimony that the planned zoning was consistent with surrounding uses. Thus, the intervenors completely failed to demonstrate that the property is in any way inconsistent with neighboring uses.

### 2. Traffic problems.

■ The intervenors have suggested that the proposed development would contribute to a substantial increase in the traffic problems which already exist on Golf Road and other streets neighboring the planned development. Joseph Zgonina, a qualified traffic engineer, testified on behalf of the intervenors. He conducted traffic counts along Golf Road at the proposed site, and supervised other investigations relating to traffic in the vicinity. Mr. Zgonina testified that if the modified Lincoln Green project were built on the subject property, there would be significant delays on Golf Road, the major arterial street at the front of the development. These delays would include additional queuing at the intersection of Golf and Goebert Roads, caused by problems of access to the development. Mr. Zgonina also speculated that some cars would take shortcuts through the development and overtax neighboring streets.

There are several factors which lead the court to give relatively little weight to Mr. Zgonina's testimony. First, Mr. Zgonina did not calculate the level of service for Golf Road,[34] either as it currently exists or as it would exist if the project were built. Second, Mr. Zgonina testified that traffic conditions comparable to those which he predicted would exist on Golf Road and the surrounding streets already exist at other points in Mount Prospect and in the northwest suburban region. Finally, Mr. Zgonina failed to calculate what traffic problems would exist if the subject property were developed according to its present zoning. His testimony was therefore of little or no value in determining whether construction of the modified Lincoln Green project would in any way create serious traffic

consent decree. *See Udell v. Haas,* 21 N.Y.2d 463, 469–74, 288 N.Y.S.2d 888, 894–97, 235 N.E.2d 897, 900–02 (1968); *Forestview Homeowners Association v. County of Cook,* 18 Ill. App.3d 230, 240–42, 309 N.E.2d 763, 771–73 (1st Dist. 1974). This factor would not by itself be dispositive, even absent the testimony concerning holding categories. *Cf. First National Bank of Highland Park v. Village of Vernon Hills,* 55 Ill.App.3d 985, 990–991, 13 Ill.Dec. 724, 728–29, 371 N.E.2d 659, 663–64 (2d Dist. 1977) (absence of comprehensive plan not determinative in new community). "Municipalities must retain the authority to modify their policies with respect to community development . . . ." *City of Highland Park v. Train,* 374 F.Supp. 758, 773, aff'd 519 F.2d 681 (7th Cir. 1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976).

**34.** The level of service is a standardized description of the amount of traffic congestion. It is measured on a scale of A to E.

problems that would not otherwise exist in the area.

To rebut Mr. Zgonina's testimony, Arlington Heights presented the testimony of Neil Kenig, a qualified traffic engineer. Mr. Kenig's firm took a more complete survey of the site than that taken by Mr. Zgonina. He anticipated some additional delays on Golf Road due to the building of the project. These delays would decrease the level of service from C, the most desirable, to D. He also testified, however, that D is not an unacceptable level of service and that many arterial streets operate at that level. In general, his testimony refuted the points made by Mr. Zgonina and convinced the court that any additional traffic problems will be manageable. Those problems presented by the intervenors are generally insubstantial, and would in no event make it inequitable to authorize construction of the project.

### 3. *Sewage.*

The intervenors claim that existing facilities are insufficient to provide for adequate collection of all the sewage that will be generated by the project. If built, the developers of the project will have to connect their sewage pipes with interceptors owned and maintained by the Metropolitan Sanitary District. The testimony demonstrated that the closest interceptor to the property is a 48-inch sewer immediately to the north on Lincoln Ave. It was undisputed that that interceptor has adequate capacity for all sewage generated.[35]

### 4. *Drainage.*

The intervenors also argued that the planned development could seriously aggra-vate existing problems of storm drainage in the area. To support this claim, they presented one expert witness, Bernard R. Hemmeter, and two residents, Daniel Tokarski and Joanne Lynne Falco. These witnesses testified about the drainage problems in the area, particularly at the intersection of Lois Court and Lawrence Lane, the northeast corner of the property. Mr. Hemmeter admitted, however, that it would be possible to design a storm retention system that would comply with all Mount Prospect and Arlington Heights standards. He also admitted that the Metropolitan Sanitary District would have to approve the system eventually chosen, since it must approve drainage systems for any development of this size. Taken together with the testimony of James E. Brown, Arlington Heights' expert witness, the evidence demonstrates that the storm drainage on the property is likely to be improved by the planned development. There is no indication that it will be significantly worsened.

### 5. *Depreciation of property values.*

The intervenors have argued that the construction of the project would substantially lower their property values. Their evidence, however, did not demonstrate that any diminution would occur.

Mount Prospect presented James P. Foley, a qualified real estate appraiser, as its expert witness. Mr. Foley estimated the range of market value for the current neighboring single-family residences at $55,000–$85,000. He testified that those houses closest to the subject property, across Lawrence Lane, would suffer a drop in value of at least 10%. On cross-examination, Mr. Foley admitted that he had ap-

---

**35.** The intervenors made an extended argument that if the developers of the project connected their sewage pipes to any of several interceptors in the area that are already filled to capacity, those interceptors would not be able to handle the sewage. That argument was specious. The intervenors did not suggest any reason why the sewage could not be delivered to the 48-inch interceptor north of the property.

The intervenors claim that their argument is justified by the court's invitation prior to the hearing that they use a "worst case" approach.

As a substitute for more extensive discovery, the intervenors were allowed to assume that any development of the subject property not specified in certain documents would have the effects most harmful to them that could reasonably be expected. This invitation, however, was not a license to assume that the developers would ignore common sense.

In any event, it is not clear that the sewage objections raised by the intervenors are a bona fide consideration. *See Developments,* 91 Harv.L.Rev. at 1656–57.

praised the Gatehouse apartment project, which is located within one-eighth to one-quarter mile of the subject property, and that houses neighboring that project had not suffered any diminution of value due to its presence. He also admitted that his prediction of a drop in value was in large part based on the planned construction of commercial buildings on the subject property. The current zoning, though allows for similar commercial uses. Since Mr. Foley's testimony did not demonstrate that the Lincoln Green project would create any greater diminution of value than could construction which conformed to the current zoning, the court finds his testimony to be of little probative value.

John McNamara, a broker and appraiser, testified as a witness for the three homeowners' associations. He claimed that the proposed development would depreciate the value of all homes in all three subdivisions represented by the associations, particularly those in the Forest View Civic Association area, which is closest to the project. Mr. McNamara stated on cross-examination, however, that he was not very familiar with either the zoning classifications of the subject property or with those neighboring the nearby Gatehouse apartment complex. He acknowledged that a townhouse project was also being built nearby the subject property, inside Arlington Heights. He acknowledged that part of the Surrey Ridge area was over one mile away from the subject property. Furthermore, while he stated that his opinion was based on similar projects, he admitted that he had no other project in mind. These factors demonstrate that his testimony was not credible evidence that the modified Lincoln Green project will lead to a substantial diminution of property values.

For the original parties, Mr. Campbell, a qualified city planning and zoning consultant, testified that there would be no diminution of property value. This testimony was supported by that given by Mr. McCann. The court finds their testimony to be credible. There has been no showing that there will be any substantial diminution in value if the project is built. Any diminution would not exceed that which would exist if the property were developed within existing zoning classifications. Thus, the intervenors have not presented any zoning objections that should interfere with the entry of the decree.[36]

## VI. CONCLUSION.

As this opinion has demonstrated, this is an exceedingly difficult case. Many of the problems discussed herein could have been avoided if Arlington Heights and the plaintiff had followed procedures more regular than those used. Much of the opposition might have been muted if Arlington Heights had consented to the building of the project at the original site, instead of on a piece of currently unincorporated land on the fringe of the Village. Nevertheless, the court is satisfied that the result it has reached is fair, and that it has adequately protected the rights of all the parties.

In this decision, the court attempted to the best of its abilities to use its broad and flexible equity powers to fashion a result that would do justice to all concerned. The court finds that none of the specific objections to the consent decree override the strong federal policies that favor open housing and the settlement of litigation. In all respects, this has been a close case. "[W]e must decide close cases in favor of integrated housing."[37]

The intervenors, having failed to prove the allegations of their pleadings, are dismissed from the case. The consent decree is hereby entered.

### APPENDIX A

### CONSENT DECREE

This cause coming on to be heard on remand from the United States Court of

36. In addition to the objections discussed in the text, the intervenors made vague allegations that the project would burden Mount Prospect's municipal services. These allegations were not substantiated.

37. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1294 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

Appeals for the Seventh Circuit and the parties hereto having settled, compromised and agreed to all matters in controversy between them and the Court being fully advised in the premises;

THE COURT DOTH FIND AS FACTS AND CONCLUDES IN LAW:

1. That the plaintiffs herein are METROPOLITAN HOUSING DEVELOPMENT CORPORATION, a not-for-profit corporation of Illinois (MHDC), ISAAC GREENWOOD, ARTHUR GUTHERIE and WILLIE RANSOM, who are black citizens of the United States, NORTHWEST OPPORTUNITY CENTER, INC., a not-for-profit corporation of Illinois, and ELUTERIA D. MALDONADO, a citizen of the United States of spanish speaking origin.

2. That the defendants herein are the VILLAGE OF ARLINGTON HEIGHTS, a municipal corporation of the State of Illinois, and RALPH CLARBOUR, ALICE HARMS, FRANK PALMATIER, JAMES RYAN, THEODORE SALINSKY, DWIGHT WALTON, JOHN WOODS, L. A. HANSON, and MARTIN MUNSEN the officers of the VILLAGE OF ARLINGTON HEIGHTS.

3. This case is on remand from the Seventh Circuit Court of Appeals and the Court has jurisdiction of the parties hereto and subject matter hereof under 42 U.S.C. §§ 3601, et seq. the 1968 Fair Housing Act.

IT IS THEREFORE ORDERED THAT:

1. The VILLAGE OF ARLINGTON HEIGHTS shall forthwith and in any event within 60 days of entry hereof, in accordance with the annexation petition attached hereto as Appendix A and hereby incorporated as part of this order, adopt an ordinance annexing the therein described property (hereinafter called the "subject property");

2. The VILLAGE OF ARLINGTON HEIGHTS shall forthwith and in any event within 60 days of entry hereof adopt amendments to its zoning and related ordinances classifying the subject property as follows:

A. *Parcel A*—Consisting of Approximately 14 Acres:

Shall be zoned B–2 General Business District under the Zoning Ordinance of the Village of Arlington Heights, with a special use for two (2) restaurants, and the zoning district map, the master plan, and all other documents relating to such zoning shall be amended and/or changed to conform with such classification. Such classification and amendment shall not be changed without the consent of Richard Ungaretti or his successor for a period of five (5) years.

B. *Parcel B*—Consisting of Approximately 12 Acres:

Shall be zoned R–5 multiple-family district under the Zoning Ordinance of the Village of Arlington Heights and the zoning district map, the master plan, and all other documents relating to such zoning shall be amended and/or changed to conform with such classification. Such classification and amendment shall not be changed without the consent of Metropolitan Housing Development Corporation or its successor for a period of five (5) years.

C. Notwithstanding any provisions of the ordinances of the Village of Arlington Heights, more than one building shall be permitted on a zoning lot and no further traffic engineering shall be required with respect to the subject property.

D. The amendments and changes to the Zoning Ordinance and other ordinances and zoning district map, master plan, and all other documents relating to such zoning shall be properly accomplished and shall be without any further notice or hearing or proceeding and the Village shall defend and hold harmless MHDC and the owners of the subject property of and from any lawsuits or other actions challenging the action provided for herein to be done by the Village.

E. Notwithstanding any provisions of the Zoning Ordinance and other ordi-

nances of the Village of Arlington Heights, Metropolitan Housing Development Corporation shall be entitled to develop Parcel B (Approximately 12 Acres) classified R–5 Multiple-Family Dwelling District in accordance with specific criteria and requirements agreed to by the Village of Arlington Heights and Metropolitan Housing Development Corporation as follows:

i. The property shall be developed subject to financing by the Illinois Housing Development Authority or other public agency authorized by the laws of the State of Illinois or the United States to finance or assist in the financing of low and moderate income housing.

ii. The development shall consist of 190 rental apartments, with one building with a height of four stories, and attached townhouses of no more than two stories. The four-story building shall consist of 109 one-bedroom and one two-bedroom apartments, of which 109 shall be available to elderly persons under the terms of the applicable financing and subsidy program pursuant to the Community Development Act and the Illinois Housing and Development Authority. The one two-bedroom unit shall be utilized for a manager. Priority shall be extended for occupancy of the elderly units in said development to residents of the Village of Arlington Heights.

iii. The attached townhouses shall consist of 20 one-bedroom, 40 two-bedroom and 20 three-bedroom units. Said townhouses shall be available for family use. Priority shall be extended for occupancy of said units to residents of the Village of Arlington Heights to the full extent permitted by law.

iv. Parking to allow 0.50 spaces per unit for elderly and 1.75 spaces per unit on all other multiple family.

v. Construction of attached townhouses shall be allowed.

vi. Height Restriction shall be amended to allow for construction of a four-story building or buildings containing elderly units.

3. The Village shall forthwith but in any event within sixty (60) days of entry of this order approve the plat of subdivision of the subject property in the form attached hereto as Appendix B which plat of subdivision attached hereto and hereby incorporated as part of this order or such other final plat of subdivision attached as Appendix B and shall approve such ordinances and resolutions as may be required. Said plat of subdivision shall be a final plat of subdivision and shall be executed by the chairman and secretary or other authorized officers of the Arlington Heights Plan Commission and the President and Village Clerk or other authorized officers of the Village of Arlington Heights and shall be recorded in the office of the Recorder of Deeds of Cook County, Illinois and:

i. The Village of Arlington Heights and all other governmental authorities necessary to register a plat of resubdivision, shall approve any future resubdivision of Parcel A provided any building or buildings to be constructed in the resubdivided Lot comply with the Bulk Regulation (Section 5.6) of the Village Zoning Ordinance and other ordinances of the Village, except as provided in the decree and further provided that the resubdivision of Parcel A shall provide for not more than eight (8) lots each of which shall be not less than 20,000 square feet in area and that each such lot created shall be served by a public or private street having a right-of-way of not less than 60 feet and a pavement width of 36 feet.

ii. The Village of Arlington Heights shall approve access to Golf Road for each lot adjoining Golf Road, providing such access shall have been previously approved by the Illinois Department of Transportation.

iii. The Village of Arlington Heights shall issue Building Permits provided all requirements of Village codes have been met, except as otherwise provided in this decree, and there shall be no further requirement of notice or hearing for such approval.

iv. The approval by the Village of this order shall constitute compliance with ordinance requirements relating to the filing and approval of preliminary and final plats by the Plan Commission and Board of Trustees.

v. Approval as required by the following Village Subdivision Control Regulations shall be expeditiously processed and approvals shall not be unreasonably withheld as to time or substance.
(a) 29–206 Preparation of Detailed Plans for Required Improvements.
(b) 29–207 Preliminary Review of Plans for Required Improvements.
(c) 29-208 Final Approval of Plans for Required Improvements.
(d) 29–210(a)(1) and (b) Additional Approvals, Certifications and Documents.
(e) 29–211 Review by Director of Engineering.
(f) 29-304 Street Layout and Design Subsections (b), (c), (i) and (k).

vi. The provisions of Article IV of the Subdivision Control Ordinance relating to dedication of lands for parks, schools and other public areas shall not apply.

vii. The Bond and Report Guaranteeing Installation of Required Improvements Subsections (a), (b) and (c) of the Village § 29-503 of the Subdivision Control Regulations shall be posted within 90 days of the date of approval of the subdivision plat or at the time of application for the first building permit, whichever shall first occur.

viii. The amendments, changes, waivers and the like required hereby with respect to the Subdivision Control Ordinance and related ordinances shall be made without any further requirement of notice or hearing.

4. That the construction of all properties on the subject property shall conform in all respects to the building codes and other applicable ordinances of the Village of Arlington Heights, except as provided for in this Order.

5. The Village of Arlington Heights shall bring water lines to the property line so that connection may be made to such water lines providing an adequate supply of water for domestic and fire protection use to the subject property in the area of the intersection of Golf Road with Goebbert Road, from the existing water supply system of the Village of Arlington Heights at the property line. Such water line to the property ready for use shall be completed by the Village of Arlington Heights within ninety (90) days and the Village shall restore all property, including streets and rights-of-way, which may be disturbed or changed by the bringing of such water lines to the property.

6. The Village of Arlington Heights shall bring sanitary sewer for the subject property at the property line, ready for use within one hundred twenty (120) days, unless otherwise approved by MHDC and the Village or the Court. The Village of Arlington Heights shall provide and pay for all engineering, legal and planning and all such other expenses, except the actual costs of construction. The cost of construction in addition to the expenses to be paid by the Village shall be paid as follows: The cost may be provided at the option of the Village by the levy of a special assessment under the Local Improvement Act of the State of Illinois or by a special service district as permitted under the Constitution and Statutes of the State of Illinois. The assessment of special taxes resulting from said special assessment or special service district shall be levied solely against the subject property and Metropolitan Housing

Development Corporation and the parties to the annexation petition have agreed not to contest a special assessment or the levy of taxes for a special service district as provided for in this paragraph and, provided they are in accordance with this order and the total costs of construction do not exceed $75,000.00, they are precluded from doing so. The Village shall provide a standard recapture agreement to MHDC and owners of other parcels in subject property.

7. That the entry of this order is solely for the purpose of terminating the litigation between the parties and that, by the approval of this order, the Village does not admit any violation of the Fourteenth Amendment, the Federal Civil Rights Act, the Federal Fair Housing Act, or any other State or Federal law. The defendants and plaintiffs herein are hereby each to the other released from all claims or indemnification, damages, attorneys fees or costs which may or could be levied against them on behalf of the plaintiffs or defendants respectively.

8. That the Court shall retain jurisdiction of this cause for the purpose of enforcing the provisions of this Decree. The order may not be amended or changed with respect to Parcel A without the approval of Richard Ungaretti, attorney for the petitioners for annexation, and as to Parcel B all changes shall be subject to Richard Ungaretti's approval in the event that he shall represent the then owners.

9. The Village and the management of the development shall meet from time to time, but not less than at ninety (90) day intervals, for the purpose of insuring the efficient and proper management of the development. The Village shall share with MHDC the right to approve the management firm for the development.

10. That this is a consent decree entered pursuant to the remedial powers of the Federal Court and pursuant to the remand with directions by the Circuit Court of Appeals for the Seventh Circuit, and the parties hereto waive all rights to appeal.

11. That pursuant to the provisions of this order, this cause be and it is hereby dismissed with prejudice and without costs.